625 A.2d 138

CITY COUNCIL OF the CITY OF PITTSBURGH, Jim Ferlo, Eugene Ricciardi, Dan Onorato, Michelle Madoff, Michelle Balcer, Dorothy Undercoffer and Daniel G. Keller,

v.

CITY OF PITTSBURGH, Sophie Masloff, Louis DiNardo and Department of Public Safety of the City of Pittsburgh, Appellants.

Commonwealth Court of Pennsylvania.

Argued March 2, 1993.

Decided April 30, 1993.

Reargument Denied June 18, 1993.

330

George R. Specter, Deputy City Sol., for appellants.

Paul D. Boas, for appellees.

Before CRAIG, President Judge, and McGINLEY, J., and NARICK, Senior Judge.

CRAIG, President Judge.

The City of Pittsburgh, Mayor Sophie Masloff, Public Safety Director Louis DiNardo, and the Department of Public Safety (collectively, the city) appeal an order of the Common Pleas Court of Allegheny County which overruled the city's preliminary objections and issued a preliminary injunction enjoining it from continuing construction of two new fire stations. Because Trial Judge Judith L.A. Friedman had reasonable grounds in the record, and an adequate basis in law, to support the granting of the preliminary injunction, we affirm the grant of the preliminary injunction.

## HISTORY OF THE CASE

The relevant background of this case, as found and narrated by the trial judge, is as follows. In November 1991 the city released a plan to reorganize the Fire Bureau which included, among other things, the proposed closing of four fire stations, two each in the North Side and South Side neighborhoods, and the construction of two new fire stations, one to serve each of those neighborhoods. Concerned with the impact the reorganization would have on the safety of its members, the International Association of Firefighters, Local No. 1, filed a grievance, which was denied in part and sustained in part by an arbitration award dated April 27, 1992.

The relevance of the arbitration award to this case is that it required all city fire trucks and engines to be staffed with a minimum of four firefighters. This minimal staffing was to be implemented in two phases, with the second phase to be completed by May 1993. Although the arbitrator's decision acknowledged the city's proposal to build two new fire stations, the award did not require the city to build those two stations, nor did it require them to be completed by May 1993. The award also did "not require the City to maintain any specific number of Firefighters in its overall complement." The award did require that the city attain minimal staffing levels on all of its fire equipment by May 1993.

To achieve the required minimal staffing levels without hiring additional firefighters, the city began to implement its reorganization plan to close some fire stations, reduce the number of companies, and build new fire stations to serve adequately the affected neighborhoods in the city. The city selected potential sites for the new fire stations, prepared drawings and plans, and submitted conditional use applications to the Pittsburgh City Planning Commission, pursuant to § 993.01 of the local zoning ordinance (Ordinance).[1]

1. Pittsburgh Code of Ordinances, effective May 29, 1979, *as amended,* §§ 101.01–1063.06. Title Nine of the Code, §§ 901.01–995.05, contains the zoning provisions.

The conditional use provisions in § 993.01 of the Ordinance relevant to the fire stations in question state:

(a) **Conditional Uses Permitted by Council Approval.** *The uses named in this category are in general those of a public* or semi-public *character, deemed to be essential and desirable for the general convenience and welfare,* and because of the nature of the use and/or its relationship to the overall plan, require the exercise of planning judgment on location and site plan.

. . . .

A. **Location and specific requirements.** *The uses listed hereunder* and the establishment or enlargement thereof *may be permitted* in the districts herein and previously designated, *by Council, when the specific conditions for approval have been met,* after a public hearing and recommendation of the Commission.

. . . .

(7) *Government uses and structures* (federal, State or *local,* other than housing) ... in any district.... (Emphasis added.)

Section 993.01(a)C of the Ordinance further specifies the procedures governing submission of conditional use applications, notice, public hearings, action by the commission, and action by city council. Thus, according to the Ordinance, after the city submitted conditional use applications for the proposed fire stations, the commission held public hearings on July 14 and July 28, 1992, and prepared to report its recommendations to city council, whose approval of conditional use applications is required.[2]

However, one day before the second hearing, the city solicitor wrote a letter to the members of the commission stating, "It is the opinion of this Department that jurisdiction does not lie with the conditional use process in determining the location

2. We note that when city council passes a resolution approving a conditional use application, council is acting in its administrative, not its legislative, capacity, and such a resolution is an adjudication for purposes of appeal. *North Point Breeze Coalition v. The City of Pittsburgh,* 60 Pa.Commonwealth Ct. 298, 431 A.2d 398 (1981).

of fire stations." The letter of July 27, 1992 further stated that:

> The issue which arises revolves around the impact of the planning and land use obligations of the municipality on the public safety obligations of the municipality. It is the opinion of this Department that in the event of a conflict between the public safety function and the land use planning function in the location of fire stations, safety must prevail over land use planning.
>
> We would respectfully ask, however, that you continue the hearing on the subject in order to apprise yourselves of the planning concerns in the specific locations. We would further respectfully request that you advise the Public Safety Department and the Department of Engineering and Construction of those concerns so that they may take appropriate action to address those concerns to the greatest possible extent.

At the July 28, 1992 hearing, the commission heard testimony from city officials and citizens concerning the proposed fire stations, but it did not rule on the conditional use applications. Instead, the commission passed two motions which advised in general terms that each of the fire stations was "in conformance with the City's Long Range General Land Use Plan ... supportive of and consistent with the land uses and development patterns in that area of the City."

The commission did not report its formal recommendations to council, and council did not approve or permit the construction of the two new fire stations. The record shows that the chief administrative officer of the city met with the city council finance committee on September 16, 1992, and discussed the city's plans, but council did not vote on the matter. The record also shows that one council member, Eugene Ricciardi, in a memorandum to the mayor dated October 30, 1992, expressed his disapproval of the city's attempts to bypass council and the public in formulating the plans for the new fire stations. In its legislative capacity, council voted to approve the city's 1993 budget, on December 18, 1992, but the budget

did not contain any specific references to the fire stations in question.

The city apparently started to build the North Side fire station sometime in November 1992, but there is no evidence in the record of the exact date on which construction began. Thereafter, the city council and four individual council members, two of whom represent the districts in which the new fire stations were proposed, filed a complaint in equity seeking declaratory and injunctive relief, alternatively in mandamus, to enjoin the city from continuing to build the two new fire stations until it complied with the conditional use approval process outlined in the Ordinance.[3]

After the city raised a question of standing, the trial court permitted three individuals to join as plaintiffs: Michelle Balcer, Dorothy Undercoffer, and Daniel Keller. Ms. Balcer is a South Side resident and is the president of the Arlington Civic Council, a South Side citizens group. Ms. Undercoffer also lives in the South Side, adjacent to the proposed fire station. Mr. Keller is a resident of the North Side and president of the Brighton Heights Citizens Federation, a North Side residents group. Although we will address the question of standing of each of the parties as raised by the city, we will refer to the plaintiffs below, appellees herein, collectively, as city council or council.

The city filed preliminary objections to city council's complaint, and the trial court heard arguments on January 26, 1993. Based on the legal arguments and evidence stipulated by both parties, the trial court overruled the city's preliminary objections and preliminarily enjoined it from continuing to build the fire stations until it obtained conditional use approval, in an opinion and order dated February 5, 1993.

The city then appealed to this court, triggering an automatic supersedeas pursuant to Pa. R.A.P. 1736. Upon city council's

3. The four individual members of council who filed the complaint are Jim Ferlo, Eugene Ricciardi, Dan Onorato, and Michelle Madoff. Mr. Ricciardi resides in and represents the South Side district in which one fire station was proposed. Mr. Onorato resides in and represents the North Side district in which the other fire station was proposed.

motion, the trial court vacated the automatic supersedeas, and that action was affirmed by this court on February 12, 1993. This appeal was argued before a panel of this court on March 2, 1993.

## STANDING

The city argues that neither the city council nor any of the named individuals have standing to sue, but we disagree. We agree with the trial court that under the standard enunciated in *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269 (1975), the city council, its individual members, and the individual residents have a direct, substantial, and immediate interest which has been harmed by the city's action.

■ The individual residents of the neighborhoods affected by the fire stations clearly have standing to question the city's building projects. This court has held that neighbors who live in close proximity to a proposed use have standing as aggrieved persons to challenge zoning decisions. *Hill v. Zoning Hearing Board of Chestnuthill Township*, 144 Pa.Commonwealth Ct. 644, 601 A.2d 1362, *petition for allowance of appeal granted*, 530 Pa. 270, 608 A.2d 495 (1992). The record reveals that each individual lives in one of the affected neighborhoods, and each of them testified before the planning commission as to their concerns about potential traffic, noise, and parking problems caused by the new fire stations.

■ Individual council members Ricciardi and Onorato, as residents of the districts in which the fire stations are to be built, have the same basis for standing as the other neighborhood residents. Furthermore, as the elected representatives of the citizens in their districts, council members Ricciardi and Onorato have standing to sue on behalf of the affected residents. In *Pittsburgh Trust for Cultural Resources v. Zoning Board of Adjustment of the City of Pittsburgh*, 145 Pa.Commonwealth Ct. 503, 516, 604 A.2d 298, 304 (1992), this court held that an association, "even without sustaining injury itself, may nevertheless have standing to commence litigation as the

representative of its members who are suffering immediate or imminent injury because of the disputed action." Given that neighbors of the new fire stations have allegedly been harmed by the city's action, those council members have standing to sue as their representatives.

■ As to the standing of the council members who do not represent the affected districts, and of city council itself, we agree with the trial court that an attempt by the city to bypass council's role in approving conditional use permits would be sufficient to confer standing on the council. In *City Council of the City of Bethlehem v. Marcincin*, 512 Pa. 1, 515 A.2d 1320 (1986), our Supreme Court ruled that the City Council of Bethlehem had standing to seek declaratory relief in an election dispute.

Section 310.a of Pittsburgh's Home Rule Charter[4] gives council the power to employ an attorney who may "represent council as a body in legal proceedings." The official commentary to § 310 of the Charter explains that "[c]ouncil is given sufficient powers to perform both a leadership role and a check and balance role in city government." In the framework of that case law and the Charter, we are satisfied that council here has standing to challenge the activities of the executive branch of city government, and to exercise its check and balance role by initiating this lawsuit.

The city finally questions city council's standing on the ground that its decision to proceed with this lawsuit was not made at an open meeting, as required by the Sunshine Act.[5] However, because, as noted above, the city council's members as individuals have standing, as do the individual neighborhood residents, there is no need to pursue this additional issue.

## TRIAL COURT'S JURISDICTION

■ The city next argues that the trial court lacked jurisdiction to issue an injunction, contending that city council

4. City of Pittsburgh Home Rule Charter (Charter), enacted November 5, 1974, *as amended*, §§ 101–813.

5. Act of July 3, 1986, P.L. 388, 65 P.S. §§ 271–286.

failed to appeal from the planning commission's "adjudication" within thirty days, as required by § 752 of the Local Agency Law, 2 Pa.C.S. § 752. We reject the city's argument because the planning commission never made an adjudication with respect to the two new fire stations, but merely offered advice.

Although, as the city correctly notes, this court has held that the inaction of a local agency can be an adjudication if the decision leaves the injured party no other avenue for appeal, *Wortman v. Philadelphia Commission on Human Relations,* 139 Pa.Commonwealth Ct. 616, 591 A.2d 331 (1991), that is not the situation in this case.

The city, through its solicitor, withdrew its conditional use application from consideration by the planning commission, and requested only that the commission "advise" the city as to planning concerns. The planning commission's advice, provided in its statements that the fire stations generally conformed with the city's long range plans, was neither an action nor inaction from which city council had the right or duty to appeal. The planning commission's advice is not an adjudication as defined in 2 Pa.C.S. § 101. Adjudication is defined as "[a]ny final order, decree, decision, determination or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties to the proceeding in which the adjudication is made." 2 Pa.C.S. § 101.

Furthermore, according to §§ 993.01(a)C(3) and (4) of the Ordinance, after the commission makes its recommendations to council on a conditional use application, council is the body that approves or denies the application. City council's action on a conditional use application is the adjudication from which aggrieved persons may appeal, not the planning commission's recommendations. City council's lack of opportunity to make an adjudication here is the crux of the dispute; the action of the planning commission was not an appealable final order.

## LACHES

The city next argues that because city council did not file its complaint until January 22, 1993, 270 days after the arbitra-

tion award was issued, and 178 days after the planning commission issued its advice, that their suit should be barred by laches. The equitable doctrine of laches is an affirmative defense to a suit which requires "not only an unjustified delay, but also that the opposing party's position or rights be prejudiced as a result of that delay." *Class of Two Hundred Administrative Faculty Members v. Scanlon,* 502 Pa. 275, 279, 466 A.2d 103, 105 (1983).

█ The city mistakenly assumes that the arbitration award requiring minimal staffing by a certain date, or alternatively, assumes that the planning commission's advice, that the fire stations conformed with the city's long range plan, provided notice to city council that it should initiate litigation. Although the record contains evidence about several instances in which the city made council aware that it *intended* to build the fire stations, the critical event which put council on notice occurred when the city began construction without conditional use permits, which occurred sometime in November 1992. Council then filed suit on January 22, 1993.

█ Further, there is nothing in the record to support the claim that council approved the construction of those two fire stations by appropriating money for the projects through the budget process. Therefore, we will consider whether the city was prejudiced by council's delay in filing its complaint, as measured from the date construction started.

The city failed to prove that the approximate two-month period between the start of construction and the filing of the complaint was unjustified or unreasonable. Nor did the city establish that it was prejudiced by council's delay in failing to institute its action. Prejudice is established where, for example, "witnesses die or become unavailable, records are lost or destroyed, and changes in position occur due to the anticipation that a party will not pursue a particular claim." *Class of Two Hundred,* 502 Pa. at 279, 466 A.2d at 105.

Changes the city made in its position, by expending resources to design and build the two new fire stations, were not made in the anticipation that council would not pursue their

claim, but rather in the hope that city council could not stop the project. The city acted in the face of ongoing disapproval by council, and it cannot now claim to be prejudiced by council's actions.

## DECLARATORY JUDGMENT ACTION

■ The heart of the city's argument is that it was under no obligation to comply with the conditional use provisions of the Ordinance because the construction of fire stations falls exclusively within the public safety duties of the mayor, and that public safety concerns override council's role in land use control. We reject the city's argument and agree with the trial court that the city is bound to follow the conditional use procedures in the Ordinance, even when the project involves construction of public safety buildings.

The city contends that certain provisions in the Home Rule Charter, the Ordinance, and the Second Class City Code [6] conflict with the conditional use provisions in the Ordinance, and that we therefore must interpret the laws to allow the city to exercise its police power without the limitation of zoning requirements. Despite the fact that, pursuant to the express terms of § 993.01(a)A(7) of the Ordinance, all local government uses and structures, except housing, in all districts, require a conditional use permit, the city argues that the police powers of the mayor and the department of public safety will be undermined if the city is forced to get approval for the locations of its fire stations.

However, there is no actual conflict among the applicable statutes governing the city's powers to administer law enforcement, to supervise the construction of public safety related buildings, and council's power to approve the location of local government buildings through the conditional use process. The following statutes and ordinances provide the interpretive framework for our conclusion.

Pittsburgh enacted its Home Rule Charter in 1974 under the authority of the Home Rule Charter and Optional Plans

---

**6.** Act of March 7, 1901, P.L. 20, *as amended,* 53 P.S. §§ 22101–25987.

Law.[7] Section 302(b)(ii) of the Home Rule Charter Law, 53 P.S. § 1–302(b)(ii), generally limits municipalities from exercising powers "contrary to, or in limitation or enlargement of powers granted by acts of the General Assembly which are applicable in every part of the Commonwealth...."

In accord with its enabling legislation, Pittsburgh's Home Rule Charter states that it shall supersede any existing charter, acts, ordinances, and resolutions of the city "to the extent that they are inconsistent or in conflict with this charter. All existing acts ... affecting the organization, government and powers of the city, not inconsistent or in conflict with this charter shall remain in full force...." Section 812 of the Charter.

The city contends that because "[t]he executive, administrative and law enforcement powers of the City shall be vested in the mayor," pursuant to § 201 of the Charter, this grant supersedes any power given to council to approve the location of public safety buildings through the conditional use process outlined in § 993.01 of the Ordinance. However, those provisions are not inconsistent or in conflict; thus, there is no need to conclude that the mayor's general law enforcement power must supersede city council's power over conditional use approvals.

Although the city correctly notes that, in the official commentary to § 201 of the Charter, "[t]he basic form of government is to be the 'strong mayor' form," the official commentary states further, "[t]his form is one in which the mayor controls and has wide powers of appointment over the units of city government, the power to initiate and veto legislation and to propose the City's budget to which council must react within a definite time." According to the Charter itself, the strong mayor form of government was not intended to confer unlimited power on the mayor—certainly not the power to ignore ordinances.

7. Act of April 13, 1972, P.L. 184, *as amended,* 53 P.S. §§ 1–101—1–1309.

For example, in § 209 of the Charter, the mayor's power to appoint the heads of "all major administrative units" is subject to council's approval. Therefore, the mayor's appointment of a director of public safety is subject to council's approval, an instance where council has authority to participate in safety and law enforcement matters even though the strong mayor has direct law enforcement powers as an administrator.

Furthermore, the fact that the director of public safety has powers and duties over "[t]he care, management, administration and supervision of police, fire and emergency medical forces," pursuant to § 116.02(a) of the Ordinance, does not conflict with council's authority to approve conditional use permits for fire stations. Nowhere in the Charter or Ordinance does the mayor or the director of public safety have the powers to determine, without council's approval, the location of public safety related buildings as part of their executive or administrative duties.

We also note that § 993.01 of the Ordinance, like the rest of the Ordinance, was passed by council and signed into law by the mayor. The general law enforcement powers given to the mayor by the Charter do not supersede the conditional use approval powers given to council because they are not in conflict.

The city further argues that, because § 22531 of the Second Class City Code, 53 P.S. § 22531, gives the department of public safety control over "all matters relating to the public health, to the fire and police force ... and the construction, protection and repair of buildings erected for police and fire purposes ...," council cannot interfere. However, because Pittsburgh is a home rule municipality, the Second Class City Code has limited applicability.

Section 301 of the Home Rule Charter Law, 53 P.S. § 1–301, states, "[a] municipality which has adopted a home rule charter may exercise any powers and perform any function not denied by the Constitution of Pennsylvania, by its home rule charter or by the General Assembly at any time." All grants of power to home rule municipalities "shall be liberally

construed in favor of the municipality," *Id.*, and ambiguities are to be resolved in favor of the municipality. *Norristown Fraternal Order of Police, Lodge 31 v. DeAngelis,* 148 Pa.Commonwealth Ct. 285, 291, 611 A.2d 322, 326 (1992).

One of the primary powers granted to the city in its Charter is to determine its organizational structure. "All units of government, except those mandated by this charter, may be established, revised or abolished by ordinance." Section 208 of the Charter. Therefore, the Second Class City Code's definition of the duties of the city's public safety director are subject to the Charter. Moreover, the public safety director's administrative supervision of the construction of fire buildings, granted in 53 P.S. § 22531, is not inconsistent with council's power to approve the location of such buildings through its conditional use powers.

In this statutory framework, the city's reliance on *School District of Pittsburgh v. City of Pittsburgh,* 23 Pa.Commonwealth Ct. 405, 352 A.2d 223 (1976) is misplaced. In that case, the school district sought to compel the city to grant a conditional use permit to expand an existing school building. Our court held that because the General Assembly specifically gave the school district the sole power to determine the size and location of its schools in the School Code,[8] that power preempted the municipality's attempt to prevent the project through its land use regulations and zoning ordinances. *Id.* The school district was required to apply for building permits and to notify the city of its plans, but the city could not prevent the project by denying conditional use approval. *Id.*

In this case, however, neither the legislature, nor the city in any of its ordinances, have given the mayor or the public safety director the exclusive power to determine the location of public safety buildings. Without such a specific grant of power, we cannot allow the city to ignore the very clear and specific conditional use provisions in an Ordinance adopted by unchallenged actions of the council and mayor.

---

8. Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. §§ 1–101—27–2702.

Likewise, the Supreme Court's decision in *Department of General Services v. Ogontz Area Neighbors Association,* 505 Pa. 614, 483 A.2d 448 (1984), does not support the city's argument in this case. In that case, the Supreme Court was presented with a conflict between the Commonwealth's power to establish mental health facilities across the state,[9] and the City of Philadelphia's power to enact and enforce zoning regulations. The Court explained its task of resolving the conflict through statutory interpretation as follows:

> Having rejected balancing, and being unable to determine legislative intent as to which agency is to prevail, we turn to the statutory construction rule that legislative intent may be determined by a consideration, *inter alia,* of the consequences of a particular interpretation.... Thus, deciding that the city's zoning authority supersedes that of the Commonwealth agency to establish a mental health facility in a particular geographical location arguably would give effect to the legislative mandates of both governmental entities, a consequence which, absent more certain legislative direction, seems advisable.

*Department of General Services,* 505 Pa. at 628, 483 A.2d at 455.

Here, because there is no conflict between the powers of the city administration and of council, as specified in the applicable laws, the Supreme Court's interpretive method in *Department of General Services* is not applicable. If the city administration wants exclusive power to determine the location of public safety buildings without council involvement, the administration can seek an ordinance to that effect. *See Department of General Services,* 505 Pa. at 628, 483 A.2d at 455.

## CONCLUSION

Where a preliminary injunction is merely prohibitory, as it is here, our scope of review is limited to determining if there were any reasonable grounds to support the trial

9. The General Assembly granted the Commonwealth that authority in the Mental Health and Mental Retardation Act of 1966, Act of October 20, 1966, Special Sess., P.L. 96, *as amended,* 50 P.S. §§ 4101–4704.

court's action. *Keen v. City of Philadelphia*, 124 Pa.Common-wealth Ct. 213, 555 A.2d 962, *alloc. denied*, 524 Pa. 600, 568 A.2d 1250 (1989). Here, council met all of the requirements for a preliminary injunction, and the trial court had ample reasonable grounds for granting it.

The often-stated prerequisites for a preliminary injunction are:

> [F]irst, that it is necessary to prevent immediate and irrepa-rable harm which could not be compensated by damages; second, that greater injury would result by refusing it than by granting it; and third that it properly restores the parties to their status as it existed immediately prior to the alleged wrongful conduct. (citation omitted). Even more essential, however, is the determination that the activity sought to be restrained is actionable, and that the injunction issued is reasonably suited to abate such activity. And unless the plaintiff's right to relief is clear and the wrong is manifest, a preliminary injunction will not generally be awarded.

*City of Philadelphia v. District Council 33, American Federa-tion of State, County & Municipal Employees, AFL–CIO*, 528 Pa. 355, 361, 598 A.2d 256, 259 (1991).

The city argues that the trial court erred in granting the injunction on the ground that council had an adequate remedy at law, through the mandamus action. We agree with the trial court that, although the legal remedy of mandamus could require the city to apply for conditional use approval, it would not prevent the city from continuing to build the fire stations while the applications were pending. In fact, the transcript of the trial court hearing reveals that the city intended to continue construction pending the trial court's ruling. There-fore, there is a reasonable basis in the record requiring the injunction to prevent the immediate harm of continued unau-thorized construction that was not compensable by damages or other remedy at law.

The city also argues that the trial court should have refused the injunction on the ground that council failed to

show irreparable harm resulting from the city's actions, or that greater harm would result from refusing the injunction than from granting it. Again, we agree with the trial court that continued construction of the fire stations without conditional use approval causes irreparable harm by attempting to force council and the taxpayers to accept a fait accompli that could only be remedied by spending more public funds to tear down the buildings, if they were indeed erected without proper authority. That harm is greater than the harm caused by the injunction. Therefore, the trial court had reasonable grounds to support the injunction on that basis as well.

Accordingly, we affirm the trial court's order as to the issuance of the preliminary injunction. Because the part of the trial court's order which overruled the city's preliminary objections is interlocutory, this court takes no action on that aspect, although we recognize that the legal issues raised by the preliminary objections substantially parallel the legal issues relating to the preliminary injunction.

PELLEGRINI, J., did not participate in the decision in this case.

## ORDER

NOW, April 30, 1993, the order of the Court of Common Pleas of Allegheny County, dated February 5, 1993, at No. GD 93–1220, is affirmed as to the issuance of the preliminary injunction.