# Pleasant Hills Construction Company Inc. v. Public Auditorium Authority of Pittsburgh

C.P. of Allegheny County, no. GD 99-15038.

*Charles F. Scarlata,* for plaintiffs.
*Arnd N. von Waldow,* for defendant Public Auditorium Auth.
*Mark S. Shaffer,* for defendant Limbach Co.

FRIEDMAN, *J.,* January 27, 2000—

## INTRODUCTION

The defendant Public Auditorium Authority of Pittsburgh and Allegheny County has appealed an order of the undersigned entered in favor of the individual plaintiff, Gary C. Hartman, hereinafter the taxpayer, preliminarily enjoining the PAA and its successors from future noncompliance with certain legislation regarding public construction projects, pending entry of a final adjudication. The court declined to grant any of the relief sought by the corporate plaintiff. The court also denied the taxpayer's request to annul the contract with defendant Limbach Company and denied the taxpayer's request to order the PAA to enter into a contract with the corporate plaintiff.[1] Neither plaintiff has appealed these rulings.

---

1. The reasons for not annulling the contract with Limbach were (1) that it would increase the harm to the public fisc (and, therefore, to the taxpayer) to *delay* the project; (2) that those responsible for the excessively costly plumbing contract with Limbach could be sur-

The order at issue is based on the interpretation of two recent pieces of legislation, Senate Bill 572 of 1999 (S.B. 572, section 22) and 72 P.S. §3919.318 (section 318), hereinafter collectively referred to as the special legislation, and their impact on earlier legislation which is still in effect, hereinafter collectively referred to as the pre-existing legislation and more commonly referred to as the Separations Act and the lowest responsible bidder requirement.

There is one main issue but many sub-issues, hence the length of this opinion. In the final analysis, the question is whether the legislature, when voting on S.B. 572 of 1999, understood and intended the word "bidding" to mean the entire bidding process, as the PAA contends, or whether they understood and intended it to mean only the solicitation of bids, as the court concluded. The PAA also contends that the language in question are words of repealer. (Transcript of hearing, p. 105, ll. 11-12.) The key legal principle about which there is *no* dispute is that words of repealer must be *express*.

The court concluded, based on the scant legislative history available, that the legislature deleted express words of repealer before they passed S.B. 572, thereby expressing an intention incompatible with the PAA's position. Lastly, the court concluded that, whoever else may have intended the PAA's interpretation, it was not the legislature when it voted on this bill.

---

charged by the appropriate auditors (thereby providing the taxpayer with an adequate remedy at law for the PAA's past violations of the pre-existing legislation); and (3) that the *prospective* injunction to prevent the PAA from *continuing* its illegal disregard of the legislation at issue was sufficient *preliminary* relief to protect the taxpayer pending a final adjudication.

## ISSUES

The PAA, the only appellant, has filed a "concise statement of matters complained of on appeal" and a "supplemental concise statement of matters complained of on appeal," hereinafter referred to collectively as statements.[2]

In its statements, the PAA raises, in somewhat different language, the following eight issues, in the following order:

(1) That the court should have deferred to a ruling in a similar case by another judge of this court.

(2) That the court should not have granted preliminary injunctive relief in favor of the taxpayer, who the PAA states is "estopped from asserting his present claims."

(3) That the taxpayer "lacks standing to bring this suit."

(4) That the court should not have "award[ed] preliminary injunctive relief in a manner never requested by plaintiffs."

(5) That the court should have afforded two other defendants, who have *not* appealed, an opportunity to be heard.

(6) That the court erroneously interpreted the special legislation.

---

2. The PAA expressly objected to the court's asking for a statement based on the PAA's belief that an "opinion," presumably the supporting memorandum that accompanied the order, had already been filed. However, this court routinely drafts memoranda to explain any order whose rationale is not self-evident, in order to give counsel for the parties an idea of why the court ruled as it did. Opinions are then written based on the matters appellants state they wish to raise on appeal.

(7) That the "plaintiffs [sic] fail[ed] to establish all the elements necessary for an award of injunctive relief."

(8) That nominal bond of $1, ordered to be filed by the taxpayer, is insufficient.

## DISCUSSION

Although the court had written an extensive memorandum in support of the order now appealed from, the PAA has limited its appeal to the eight alleged errors described above. Except for item no. 6, which the court believes is dispositive and therefore addresses first, the alleged errors will be discussed in the order listed by the PAA.

### 1. *The Court Correctly Interpreted the Special Legislation*

This issue was the main focus of the memorandum and should be the main focus on appeal despite its obscure position on the PAA's list. The following discussion is substantially the same as set forth in the memorandum when the order in question was entered, but it is included herein for the convenience of the appellate courts and is somewhat rephrased and expanded.

This case is different from most cases brought by a disappointed low bidder because here the PAA admits that the corporate plaintiff was not only the lowest bidder for the plumbing contract for PNC Park, the new ballpark for the Pittsburgh Pirates Baseball Club, but also that it had been "pre-qualified," which the court ruled was the same as a "responsible" bidder.[3] For purposes of

---

3. This ruling, reiterated in the memorandum, at p. 2, is not one of the stated bases for appeal.

argument on the instant petition, the PAA also admitted that, were it not for the special legislation, it would have been required, under the pre-existing legislation, to enter into the plumbing contract for the ballpark with the corporate plaintiff.[4]

The case law is replete with discussions of the validity and effect of the pre-existing legislation. There are years of discussions by the appellate courts as to the impact of the pre-existing legislation on entities such as the PAA. The net effect of the appellate decisions on the pre-existing legislation is undisputed by the parties herein: entities such as the PAA are required to solicit separate bids for each major branch of a construction project, *i.e.,* for the plumbing work, the electrical work, the heating work and the ventilation work, and to award the contracts for such work to the lowest responsible bidder. The pre-existing legislation is well-known and well-settled. The court could not, therefore, assume that it would be nullified by vague or ambiguous language.

The pertinent portions of both pieces of the special legislation[5] are as follows: "Notwithstanding any other law to the contrary, the requirements of section 318 of the Act of February 9, 1999 (P.L. 1, no.1), known as the Capital Facilities Debt Enabling Act, [and found at 72 P.S. §3919.318], shall provide the sole and exclusive requirements for bidding for the construction or renova-

---

4. This admission was also previously referred to in the memorandum, at p. 2. Its existence and effect have not been contested in the PAA's statements.

5. The full text of the special legislation is set forth later in this portion of the opinion, beginning on page 455. The full text of the pre-existing legislation is not quoted herein but is found at 53 P.S. §1003 and 16 P.S. §5517 (the Separations Act) and 53 P.S. §23851 (lowest responsible bidder requirement).

tion of a redevelopment assistance capital project authorized in a capital budget itemization act on or before [sic] the effective date of this Act. [Section 318 provides] the solicitation of a minimum of three written bids is required for all general contracted work in [such] projects."

We interpreted the special legislation according to the usual rules of statutory construction, first reading the express language of the statute, and ascertaining its ordinary meaning given the ordinary definitions of words and phrases and the ordinary grammatical implications of the sentence structure used. We concluded that ordinary usage results in there being another, more reasonable interpretation of the special legislation than that espoused by the PAA. In addition, an examination of language that was *deleted* from the special legislation revealed that the legislature had *deleted* words that *expressly* created an exemption. The court concluded that the words that remain in the Act as passed were *not* intended to create an exemption.

The court's understanding of the pertinent language of the special legislation is as follows:

" 'Bidding' means only the solicitation of bids; it does not mean the entire bidding process. Regardless of whether or not other laws permit fewer than three bids for general contracted work on government construction projects, the solicitation of a minimum of three written bids is required for all general contracted work in projects such as the PNC Park. The rest of the bidding process is unaffected by this special legislation."

The PAA's interpretation of the pertinent language of the special legislation is as follows:

" 'Bidding' means the entire bidding process; it does not mean only the solicitation of bids. The PAA has al-

most absolute discretion over the entire bidding process for projects such as the ballpark being constructed by the citizens of Pennsylvania for the Pirates. The PAA's discretion is limited only by one requirement, that it solicit 'a minimum of three written bids . . . for all general contracted work in [such] projects.' "

Having accepted for purposes of argument the PAA's contention that its literal reading of the special legislation is "reasonable," we then had to try to determine which of the two possible interpretations was correct. Does the word "bidding," as used in the special legislation, mean solicitation of bids or does it mean the entire bidding process?

We searched the evidence for indications of the legislative intent regarding exemption, looking for legislative history or comments by the proponents and opponents of the legislation prior to its passage. There was little history (none of which is favorable to the PAA's position, as will be discussed later herein).[6] There were no relevant comments attributable to the legislature available for our consideration. We therefore looked to the language the legislature has used on other occasions when

---

6. There are apparently no legislative comments on the special legislation. The PAA argued that we could find the legislative history and intent in the affidavit of K. Scott Baker, a "government affairs consultant," *i.e.,* a lobbyist for an unnamed entity. However, Mr. Baker's affidavit, while replete with legal conclusions, is devoid of any facts from which such conclusions could be drawn. He gives no factual basis for his knowledge of the events surrounding the passage of the legislation; he gives no facts regarding the events themselves; he gives no information about his own background or experience. This totally insufficient offer cannot be accepted as probative of the legislative intent regarding the special legislation. There is no precedent for this bootstrap method of statutory construction.

it has decided to exempt certain projects or conduct from the effect of the pre-existing legislation.

A review of other legislation reveals that on the rare occasions when the legislature decided it was wise to give a governmental contracting entity the power to avoid compliance with the pre-existing legislation, *i.e.,* the option *not* to solicit separate bids and *not* to contract only with the lowest responsible bidder, it stated this in no uncertain terms.

For example, in recent legislation passed in 1998 regarding the construction of state prisons and the conversion of county jails (Act 1999-37), the legislature included very clear, concise, and simple language stating that those responsible for such projects were to be exempt from the same pre-existing legislation as is at issue here. The legislature added subsection (g) to 16 P.S. §5001, entitled "County commissioners to make contracts." Subsection (g) permits "an alternative contracting procedure to achieve the adaptive reuse of former jail facilities . . . [if the commissioners determine by resolution] that the use of an alternative contracting procedure is the most efficient, economical, and timely method to secure an adaptive reuse of former jail facilities." 16 P.S. §5001(g)(1). The 1998 amendment expressly states, "The award of a contract for the adaptive reuse of former jail facilities *need not be awarded to the lowest [responsible] bidder.*" 16 P.S. §5001(g)(2). (emphasis added) Subsection (g) also expressly states, "Any contract for the adaptive reuse of former jail facilities awarded under this subsection [g] *shall be exempt from and not subject to* [provisions requiring, inter alia, the solicitation of separate bids for the major branches of construction]." 16 P.S. §5001(g)(3). (emphasis added)

The legislature was similarly very clear and explicit in the Prison Facilities Improvement Act, passed in 1990 and found at 61 P.S. §390.503. In that Act, the legislature expressly exempted certain projects from the portion of 53 P.S. §1003 that requires separate bids and awards, saying, "The projects itemized [earlier in the Act] *are exempt* from the provisions of the first paragraph of [53 P.S. §1003]." The Prison Facilities Improvement Act also expressly gave the Department of General Services the discretion to "contract for construction management services and to develop a procedure providing for incentive payments of contractors for early completion." 61 P.S. §390.503.

Another example of a clearly stated intention to exempt is found at 72 P.S. §4051, which expressly stated that "limits heretofore imposed [by certain named laws] upon the rates of interest and interest costs permitted to be paid upon bonds . . . are hereby removed . . . ." The legislature made what appears to be a fairly comprehensive list of prior Acts whose effect with regard to interest rates was being nullified. (Among the governmental entities whose limits on interest rates and costs were expressly removed were those covered by the Public Auditorium Authorities Law.)

In sharp contrast to these clear and unambiguous expressions of intent to exempt certain public construction projects and public contracting entities from the effect of well-settled restrictions, we have the language of the two pieces of special legislation, quoted in full below, with the pertinent portions italicized:

"(1) Senate Bill 572 of 1999:

"Section 22. Redevelopment assistance capital projects.

"(A) Requirements for.—

"(1) *Notwithstanding any other law to the contrary, the requirements of section 318 of the Act of February 9, 1999 (P.L. 1, no. 1), known as the Capital Facilities Debt Enabling Act, [and found at 72 P.S. §3919.318], shall provide the sole and exclusive requirements for bidding for the construction or renovation of a redevelopment assistance capital project authorized in a capital budget itemization act on or before [sic] the effective date of this Act.*

"(2) Any public authority shall be eligible to contract with the Commonwealth to receive funds for the construction or renovation of a redevelopment assistance capital project authorized in a capital budget itemization act on or before the effective date of this Act.

"(B) Construction.—Nothing in this section shall be construed to override or abrogate any provision of the Act of March 3, 1978 (P.L. 6, no. 3), known as the Steel Products Procurement Act.

"(2) 72 P.S. §3919.318:

"Section 3919.318. Funding and administration of redevelopment assistance capital projects.

"(a) Officers.—The secretary of the budget, in consultation with the secretary of community and economic development, shall approve or disapprove redevelopment assistance capital projects.

"(b) Time period.—State funding for approved redevelopment assistance capital projects shall be paid over not less than a 36-month period unless the secretary of the budget authorizes a shorter period.

"(c) Costs.—Fees for professional services incurred for the design and construction of redevelopment assistance capital projects shall be paid from non-state funds.

Land acquisition is a permissible state-funded expenditure if the acquisition cost is supported by an appraisal done by a certified appraiser.

"(d) Proportion.—Expenditure of state and non-state funds shall be made on a proportional basis for direct land and building acquisition costs and construction expenses.

"(e) Verification.—Redevelopment assistance capital project cost estimates must be verified by the office of the budget or its designated agent before final approval is given to a project application. Cost estimates include total project cost, projected use for state and non-state funds and a year-by-year schedule of costs for the entire project construction phase.

"(f) Bids.—The solicitation of a minimum of three written bids is required for all general contracted work in redevelopment assistance capital projects.

"(g) Review and audit.—Redevelopment assistance capital projects shall be reviewed at regular intervals by the office of the budget or its designated agent during the funding phase to ensure financial and program compliance. A final closeout audit shall be performed by the office of the budget or its designated agent for all projects.

"(h) Fee.—To pay for administrative expenses related to redevelopment assistance capital projects funded by Commonwealth general obligation bonds, the office of the budget shall charge a fee against proceeds from bonds and notes which were sold to finance construction or acquisition costs of projects."

The PAA contends that the word "bidding" in section 22 can *only* mean the "bidding process," *i.e.*, both the solicitation of bids and the awarding of a contract to a particular bidder. That supposed definition combined

with the language of the introductory phrase, "Notwith-standing any other law to the contrary," is said to be an unambiguous expression of the intent of the legislature to exempt the PAA's ballpark project from *all* of the long-standing and well-settled requirements of the pre-exist-ing legislation. However, by reading the *complete* text of section 22, regarding the "sole and exclusive require-ments for *bidding*," we are directed to section 318 (72 P.S. §3919.318), which discusses only one aspect of the bidding *process,* the solicitation of bids, in particular a requirement of a minimum number of bids. Section 318 is silent as to the rest of the bidding process, such as how one of the "three written bids" will be selected for the award of the contract. That silence negates the legisla-tive intent the PAA urges this court to accept as true. "Bidding" in section 22 *cannot* mean "the bidding proc-ess" because section 318 does not refer to the complete bidding process, but only to the solicitation aspect of that process. In other words, the apparent meaning of section 22 and section 318, the special legislation upon which the PAA relies, is that the usual bidding *process* has been modified to *add* a requirement that a mini-mum number of written bids be solicited for "all general contract work" in projects such as the PNC Park. It is undisputed that the usual bidding process is contained in the pre-existing legislation. The special legislation is si-lent as to there being any exemption from the require-ments of the pre-existing legislation, which deals with the *complete* bidding process.

Since we know, from the examples discussed above, that in the very recent past the legislature has clearly expressed its intention to create an exemption when it has wanted to do so, it is logical to assume that it would

also have done so in this case. Almost a quarter-billion dollars is involved in the instant project. The legislature also anticipated redevelopment assistance capital spending of an additional half-billion dollars on other projects. The sections referred to herein as "special legislation" are clearly a part of very important bills regarding very large projects and the funding for them. The legislature's silence in such an important, expensive, and detailed undertaking as redevelopment assistance capital projects is therefore highly probative of its intention that the pre-existing legislation will continue to apply to the PAA and the instant construction project.

This conclusion is fortified when we see that express words of exemption were deleted from S.B. 572 before passage. Looking to other sources for expressions of the instant legislative intent in the legislative history of the special legislation or in official comments about the special legislation, we find very limited written legislative history, consisting only of an earlier draft of S.B. 572 of 1999. That draft (in the record as a "note of evidence" filed by the PAA) shows that S.B. 572 of 1999 originally included section 20B, quoted below. That deleted section is a much more specific statement of legislative intent as to the *entire bidding process*. The deleted language is fully set forth below, with the pertinent portion italicized:

"Section 20. Conditions And Limitations On Certain Capital Projects. . . .

"(B) Sports facilities bidding, procurement, etc.—*the sole and exclusive requirements for bidding, procurement, preparation of bid specifications and contracting for the construction or renovation of any project* contained in sections 6(2)(I)(X) and 6(35)(I)(WW) of the

Act of October 10, 1997 (P.L. 392, no. 47), known as the Capital Budget Project Itemization Act for 1996-1997, and for the construction or renovation of any facility that receives a grant of Commonwealth funds under chapter 5 of the Act of February 9, 1999 (P.L. 1, no. 1), known as the Capital Facilities Debt Enabling Act, shall be those set forth in:

"(1) Section 318 of the Capital Facilities Debt Enabling Act.

"(2) The Act of March 3, 1978 (P.L. 6, no. 3), known as the Steel Products Procurement Act.

*"No other law, code or regulation relating to bidding, procurement, preparation of bid specifications or contracting for construction or renovation shall apply."*

See note of evidence, submitted by the PAA during the hearing and filed of record.

The PAA contends that the deletion of section 20(B) is of no probative value. However, the words deleted include "requirements for bidding, procurement, preparation of bid specifications and contracting for the construction or renovation of any project." This is very strong and fairly clear language covering *all* stages of the bidding process, especially when combined with the other words, also deleted, that say, "No other law [regarding all these stages of the bidding process] shall apply." The fact that such explicit language was *not* retained in the final bill strongly suggests that the ambiguous and obscure language in section 22 of S.B. 572 was *not* intended to exempt the PAA's ballpark or other projects from compliance with the pre-existing legislation.

The PAA also argued that the legislature's failure to mention the pre-existing legislation as an exception to the special legislation is an indication of the legislature's

intent that the pre-existing legislation not apply. The PAA says that since the legislature only named one specific prior law that *would* apply (the Steel Procurement Act), all other laws ordinarily applicable to the PAA's award of contracts are of no effect for a redevelopment assistance project. However, as the PAA admits, it is well-settled law that repeal must be *expressly* stated. There can be no repeal of existing legislation by mere implication.

Exemption is a less broad form of repeal and would require similarly clear language. Here, the clearest meaning of the combined language of the special legislation is, as previously stated, "if any other law permits less than three written bids for general contracted work, such law will not apply to redevelopment assistance projects." The language that was *not* included in the special legislation is express language of repeal. Had 20(B) remained in S.B. 572, there would be little doubt that the legislature intended to give governmental entities such as the PAA carte blanche with regard to awarding contracts such as the one in question. Were that the case, we would only be looking at the legal significance of the PAA's midstream change of the rules. The "notice" to bidders as set forth in the July 19, 1999 "Addendum no. 4" (stipulation no. 19, exhibit C to Pleasant Hills' second amended complaint) would be our sole focus.

However, the language of 20(B) did *not* remain in the Act that was passed. The note of evidence submitted by the PAA shows what the legislators had *available* for review when they voted: a proposed law with certain portions, such as 20(B), deleted but legible. Counsel for the PAA tried to argue, *dehors* the record, that the legislators did not have a marked-up copy of S.B. 572. Aside

from the fact that no reliable evidence supports much of what the PAA says regarding the circumstances of S.B. 572's passage, the question as to what the legislators "knew" is also a question of what they are *held* to have known. The legislature is deemed to have been aware that *express* words of repeal or exemption were deleted from and *not* part of the law they were passing. How then can we conclude, as the PAA contends, that this same legislature intended by implication to do that which they *expressly* did not do?

All the legislature had to do to express the intent the PAA claims it had was to use the clear and concise language that it has used on other occasions when it wished to exempt projects or entities from the effect of the pre-existing legislation. Even the deleted language of section 20(B) would probably have done the trick. However, the fact that the legislature did not use any such explicit language, coupled with the absence of any extrinsic evidence of an intent to exempt the PAA and projects such as the ballpark, leads to only one conclusion: the legislature did not intend to exempt the PAA from the requirements of either the Separations Act or the Public Auditorium Authorities Law.

## 2. The Court Considered the Ruling of the Other Judge of This Court and Correctly Concluded That It Was Not Binding in the Instant Case

The court has been put in the uncomfortable position of being accused of ignoring or criticizing a colleague's decision, an accusation that is not founded in fact. In addition, the other judge must feel uncomfortable as well, to have his brief commentary regarding an interlocutory order which was *not* appealed be given the sacrosanct

status the PAA advocated, not only in the courtroom but also in the press.

The undersigned regularly defers to the rulings of other members of this court, especially when the reason for the ruling is either self-evident or clearly stated. However, as previously discussed in the memorandum at p. 4, footnote 2, a review of the opinion in the other case, *Reed v. Public Auditorium Auth.*, Allegheny County docket no. GD 99-12217, Commonwealth Court docket no. 2052 C.D. 1999, appeal discontinued on November 12, 1999, shows that the judge denied a special injunction (*i.e.*, an immediate injunction entered without taking testimony followed by an evidentiary hearing within five days) but granted the request for an evidentiary hearing on whether or not a preliminary injunction should issue pending a final adjudication. One of his stated reasons was indeed that put forth by the PAA, that "the bidding procedures and contract administration methods being utilized by the PAA were authorized by the legislature." However, this is the sum total of his opinion regarding the special legislation. He did not discuss the basis for his conclusion nor any of the arguments or counter-arguments made to him, so no comparison could be made with those made to the undersigned. Furthermore, the fact that the judge did not dismiss the *Reed* petition for preliminary injunctive relief suggests that the legal conclusion he reached was a tentative one, justifying denial of an immediate special injunction without a hearing, but not intended to be binding on either plaintiff Reed, instant plaintiffs, nor on the undersigned. This would be analogous to the well-settled rule that a decision regarding a preliminary injunction is not binding for purposes of a final adjudication. See *Berger v. West Jefferson Hill*

*School District*, 669 A.2d 1084, 1086 (Pa. Commw. 1995).

The jurisprudential reasons for deference or non-deference to the decisions of other judges are well-known. They are summarized in various parts of Standard Pennsylvania Practice, a highly regarded, multi-volume source of information, analysis, and historical perspective regarding all aspects of Pennsylvania law and equity practice. Among the reasons for deference is the doctrine of stare decisis,[7] discussed in sections 2:191-2:195. "[A] test to determine whether the rule of stare decisis will be invoked is whether or not the question involved in the case to be decided was *necessarily involved in determining* the earlier cases." 1 Standard Pennsylvania Practice §2:193. This doctrine generally applies to cases where there is prior *appellate* law. Stare decisis does not apply to decisions of lower court judges of coordinate jurisdiction and does not require deference in this case.

In section 2:197 of Standard Pennsylvania Practice, there is also a discussion of the deference owed by coordinate judges to prior interlocutory rulings *in the same case.* Even in the *same* case, an "exception [to the rules and customs favoring deference] also exists where new evidence is placed on the record in the interim between the first trial court's ruling and the second trial judge's reassessment. The second judge is authorized to overrule the first judge if new evidence or newly decided legal authorities compel him or her to do so." 1 Standard Pennsylvania Practice §2:197. (citations omitted) Since

---

7. Stare decisis is a Latin term meaning, roughly, "that which has been decided, stands." It refers to the need for courts "to abide by, or adhere to, decided cases." Cf. Black's Law Dictionary.

the *Reed* opinion was written without *any* evidence having been submitted, it would have had little precedential value even in the *same* case.

Given these well-settled principles, it is disingenuous of the PAA to raise our refusal to defer to the tentative ruling in *Reed* as a basis for its appeal in the instant case.

### 3. *The Taxpayer Was Not "Estopped" From Asserting His Present Claims*

Since the PAA does not, in either of its statements, elaborate on what kind of "estoppel" it refers to, nor does it state what evidence supposedly gives rise to such estoppel, the court is forced to guess what this basis for appeal is. The word "estoppel" was used by counsel for the PAA during oral argument, but in the context of the bar of the doctrine of laches. It is this doctrine the court believes the PAA has in mind. Another possible meaning suggested by the PAA's oral argument is that plaintiffs' *notice* of the change in bidding procedure coupled with the fact that the corporate plaintiff nevertheless submitted a bid after notice, "estops" plaintiffs from now complaining about the illegality of the altered procedure. These are the only two references to "estoppel" that the court is aware of. The court concluded that neither laches nor notice barred the instant complaint and the ancillary motion for preliminary injunction. If the PAA intends a third meaning by this item, it is respectfully suggested that waiver applies.

The factual basis upon which the court found that laches did not apply is found in the transcript of the hearing and argument at pp. 22 to 26, where counsel for plaintiffs explained the reasons for the delay that the PAA asserted constituted laches or an estoppel. Briefly sum-

marized, plaintiffs expected to join in the evidentiary hearing scheduled in *Reed;* that hearing was postponed because of the pending appeal in *Reed* (later discontinued) and a hearing on the petition in the instant case was then separately scheduled; eventually, the matter was heard by the undersigned.

The maximum period of delay asserted by the PAA begins no earlier than July 19, 1999, the day the PAA says it gave plaintiffs and others notice that it would not comply with the pre-existing legislation, and ends no later than September 17, 1999, the day plaintiffs filed their instant motion for preliminary injunction. Plaintiffs assert the earliest starting date for laches is sometime after August 16, 1999, the date that the PAA awarded the contract to Limbach at a public meeting, and the first time that plaintiffs were put on notice that a higher bid than theirs may have been accepted, in violation of the pre-existing legislation. The delays after September 17, 1999 were unavoidable, were caused by the civil division's central calendar system, and are not attributable to plaintiffs.

In order for a delay to bar relief, there must be some prejudice to the party asserting laches. In the instant case, whether the delay was two months or one month, there was no prejudice to the PAA as a result of the delay. Laches does not bar the relief actually granted. At best, the delay might bar the nullification of the Limbach contract, relief that was *denied.*

As to the PAA's other "estoppel" argument, it seems clear that justice does not permit a wrongdoer to escape the consequences of his illegal conduct merely by first informing the victim of his intent to commit the illegal act in question.

### 4. *The Taxpayer Has Standing To Bring This Suit*

The court relied on long-standing precedent for its conclusion that the taxpayer has standing in equity to seek equitable relief, especially the relief actually granted by the order in question. See *e.g., Wm. Penn Parking Garage Inc. v. City of Pittsburgh,* 464 Pa. 168, 346 A.2d 269 (1975) and its progeny, especially *Application of Biester,* 487 Pa. 438, 409 A.2d 848 (1979); *Sprague v. Casey,* 520 Pa. 38, 550 A.2d 184 (1988); *City Council of the City of Pittsburgh v. City of Pittsburgh,* 155 Pa. Commw. 328, 625 A.2d 138 (1993), upholding this court's decision at GD 93-1220; and *Rizzo v. City of Philadelphia,* 668 A.2d 236 (Pa. Commw. 1995). The Supreme Court in *Biester, supra,* reiterated the law regarding a taxpayer's standing to sue a governmental entity:

"The purpose of the requirement of standing is to protect against improper plaintiffs. [Citing] K. Davis, Administrative Law Text §22.04 (3d ed. 1972). A plaintiff, to meet that requirement, must allege and prove an interest in the outcome of the suit which surpasses 'the common interest of all citizens in procuring obedience to the law.' . . . To surpass the common interest, the interest is required to be, at least, substantial, direct, and immediate. [Citing] *Wm. Penn, supra." Biester* at 442-43, 409 A.2d at 851.

More recently, the Commonwealth Court unequivocally confirmed that well-settled law gives the instant taxpayer standing to seek protection from illegal or unconstitutional invasions of the public fisc.

In *C. O. Falter Construction Co. v. Towanda Municipal Authority,* 149 Pa. Commw. 74, 614 A.2d 328 (1992),

the Commonwealth Court discussed suits by taxpayers and disappointed bidders on public contracts.

"In Pennsylvania, a taxpayer of a contracting jurisdiction who is also a disappointed bidder has standing to enjoin the award of a public contract. . . . However, the action is that of the taxpayer, not of the disappointed bidder. . . . A disappointed bidder who is not a taxpayer in the contracting jurisdiction does not have standing to challenge the award of a public contract." 149 Pa. Commw. at 77, 614 A.2d at 330. (citations omitted)

In other words, the crucial element for taxpayer standing appears to be an interest beyond that of *every* taxpayer in any expenditure of money or other conduct by a governmental entity. Here, the taxpayer who also is a shareholder of the corporate plaintiff has suffered special harm in addition to that suffered generally by all taxpayers of the state and county because of the PAA's illegal conduct. As a result, he has standing to ask the court for relief. Appropriate relief includes enjoining the continuation of such conduct.

### 5. *The Court Awarded Relief Consistent With the Request of the Taxpayer, the Only Successful Plaintiff*

There is no merit to the PAA's contention that there was "an error of law in awarding preliminary injunctive relief in a manner never requested by plaintiffs." It is axiomatic that the court, particularly when sitting in equity, is not limited by a party's specific requests for relief. In the instant case, furthermore, both plaintiffs requested, inter alia, "such other equitable relief as is just and appropriate under the circumstances." Under the instant circumstances, the prospective preliminary injunc-

tion issued in favor of only one plaintiff, the taxpayer, was "just and appropriate," as plaintiffs requested, even though both plaintiffs had hoped for more.

### 6. *The PAA Had an Opportunity To Be Heard; It Is Irrelevant to Its Appeal Whether Other Parties Had Such an Opportunity*

The PAA does not complain that it was denied an opportunity to be heard; rather, it claims other parties were not heard. It is elementary that the PAA does not have standing to complain that its co-defendants were not given an opportunity to be heard. Even though counsel for the PAA also represents the Pirates,[8] his other client has not joined in the instant appeal. Furthermore, neither the Pirates nor the other co-defendants have raised this issue themselves by way of a motion to this court for reconsideration or for a hearing, nor by any other means. They are the only parties entitled to complain of any denial of their due process rights. Their failure to ask to be heard is deemed to mean that their rights were not violated by the order in question, as is their failure to appeal that order. Their silence is unsurprising since they are not "indispensable parties" in equity, but merely are "necessary" parties whose joinder was required for ju-

---

8. The court was informed of this dual representation during a status conference and cautioned the PAA's in-house counsel and its trial counsel to evaluate whether there was or was not a potential for conflict, given the nature of the contractual relationship between the PAA and the Pirates. The matter was raised again, by the court, sua sponte, before the start of the instant hearing. After discussions with counsel for the PAA, the court concluded that, at a minimum, the Pirates could be said to have waived any conflict even though the PAA, given its duties to the public, might not be permitted to waive a conflict.

risdictional purposes so that they could be heard if they chose.

### 7. *The Injunctive Relief Granted Was Granted Only to the Taxpayer Plaintiff Who Established All the Elements Necessary for Such Relief*

In its statements, the PAA says that the "plaintiffs" (plural) did not make out their case. However, the court did not rule in favor of both plaintiffs, only in favor of the taxpayer. The corporate plaintiff only established some of "the elements necessary for an award of [preliminary] injunctive relief" and so no award in its favor was made. In other words, the PAA "won" as to the corporate plaintiff.

The taxpayer, on the other hand, was able to establish "all the elements necessary for an award of [preliminary] injunctive relief" and the relief he was granted was therefore proper.

The three essential prerequisites for the issuance of a preliminary injunction were set forth in *New Castle Orthopedic Assoc. v. Burns,* 481 Pa. 460, 392 A.2d 1383 (1978). Those prerequisites are, first, that the preliminary injunction be necessary to prevent immediate and irreparable harm not compensable by damages, second, that it would be more injurious to refuse than to grant it, and third, that it restore the parties to their status as it was immediately prior to the alleged wrongful conduct. 481 Pa. at 464, 392 A.2d at 1385. A fourth requirement is whether, when the issue is finally resolved, the petitioner will prevail on the merits, *i.e.,* whether he has a clear right to [final] relief. See *American Federation of State, County and Municipal Employees v. Commonwealth,* 77 Pa. Commw. 37, 465 A.2d 62 (1983). During

oral argument, the PAA described a fifth requirement, "that the alleged wrong be manifest," which the court believes is subsumed under the fourth, and discusses accordingly.

The PAA in its statements specifically refers to only one of these elements as not having been satisfied: whether or not the taxpayer will prevail on the merits, *i.e.,* the interpretation of the special legislation, which is discussed in item 1, above. As to the other elements, the fact that they have been met seems self-evident, but each is briefly discussed below.

### (a) The Taxpayer Would Suffer "Irreparable Harm" Without the Preliminary Injunction

The requirement that there be "irreparable harm" is made out by the undisputed violation of the pre-existing legislation. *"[W]here the right invaded is secured by statute* or contract, there is generally no question of the amount of damage, but simply of the right." *Pennsylvania Public Utility Commission v. Israel,* 356 Pa. 400, 52 A.2d 317 (1947), quoting *Commonwealth v. Pittsburgh & Connellsville Railroad Co.,* 24 Pa. 159, 160 (1854). (emphasis added)

Given the limited *prospective* preliminary relief that was granted to the taxpayer, any further "balancing" of relative harm by the court would have infringed on the legislature's prior balancing of public and private interests when it passed the pre-existing legislation (which, as already discussed, still applies to redevelopment assistance capital projects undertaken by entities such as defendant PAA).

## (b) More Harm Would Have Resulted From Denying the Preliminary Relief in Question Than From Granting It

The requirement that more harm would result from denying relief than granting it must be evaluated in light of the relief actually granted. As set forth on page 12 of the memorandum, it was too late to provide the corporate plaintiff with preliminary relief *in equity,* because a balancing of the harm it had already suffered against the future harm an injunction would cause the taxpayer, and Limbach showed that more monetary harm would result from the grant of the preliminary injunction in favor of the *corporate* plaintiff than from its denial. Had the court nullified the existing contract, Limbach (who on the evidence so far is apparently not a wrongdoer) would then have been entitled to money damages from the PAA for its lost profits. The taxpayer would have to pay for the PAA's breach with Limbach or it would have to pay for the breach with the instant corporate plaintiff. These items cancel each other out, more or less. However, the court accepted as true, for purposes of argument, *the PAA's allegation* that there would be, in addition, very high costs incurred from inevitable delay if the court nullified Limbach's contract. This was the extra harm that would have resulted if the corporate plaintiff had been granted the injunctive relief it wanted. Therefore, the corporate plaintiff did not prevail because *more* harm, not less, would have been created by annulling the contract with Limbach, the relief sought by the corporate plaintiff.

However, the harm suffered by the taxpayer comes from the PAA's violation of *legislation,* so the ban on continued violations in the future in connection with the

awarding of future contracts by the PAA in connection with its projects was, on balance, both proper and necessary.

### (c) The Injunction Restored the Status Quo

The status quo ante the PAA's wrongful conduct was restored as much as possible by the preliminary injunction, which requires the PAA and its successors not to violate the pre-existing legislation in the future. The PAA had the duty to honor the pre-existing legislation before it awarded the plumbing contract in question, and the court order "restored" that duty with regard to contracts entered into by the PAA after the date of the order. The court could have restored more of the status quo ante the wrongful conduct only by annulling the PAA's contract with Limbach, action that the PAA successfully opposed.

### 8. *Nominal Bond Is Sufficient and Within a Court's Discretion Where the Preliminary Injunction Is in Favor of a Taxpayer and Against a Government Entity*

With regard to the amount of bond set for the injunction received by the taxpayer, the nominal sum of $1, we were guided by the principle enunciated by Commonwealth Court, coincidentally in another case where statutory bidding requirements applicable to contracts under the Municipal Waste Planning Act were violated by a governmental entity. See *Stapleton v. Berks County,* 140 Pa. Commw. 523, 593 A.2d 1323 (1991), *allocatur denied,* 529 Pa. 660, 604 A.2d 251 (1992), in which Commonwealth Court granted the plaintiff taxpayer relief after the trial court had denied him a preliminary injunction.

The Commonwealth Court held that, in a "taxpayer's suit which alleges that the irregularities in the process defeated the safeguards that competitive bidding was designed to insure, . . . the threat to the public fisc . . . was real." *Id.* at 542, 593 A.2d at 1332. The *Stapleton* court then held "that the contract must be annulled and new bids submitted." 140 Pa. Commw. at 542, 593 A.2d at 1332.[9]

The Commonwealth Court expressly declined to impose *any* security requirement upon the taxpayer for the issuance of its preliminary injunction in *Stapleton,* even though the relief granted to that taxpayer (nullification) was more extreme than that ordered here. The county and the previously successful bidders whose contracts *Stapleton* annulled had asked the court to require a bond of $34,000,000 before its preliminary injunction would be effective, an amount comparable to that requested by the PAA in the instant case, and for reasons similar to those expressed by the PAA.

---

9. The main holding in *Stapleton* is based on *American Totalisator v. Seligman,* 489 Pa. 568, 414 A.2d 1037 (1980), a case with bidding procedures that seem very close to those used in the instant case by the PAA. The Supreme Court said, "When competitive bidding is used and the procedures followed emasculate the benefits of such bidding, we believe judicial intervention is proper." 140 Pa. Commw. at 538, 593 A.2d at 1330. Furthermore, as discussed in *Stapleton, supra* at 533, 593 A.2d at 1328, "the law prefers competitive bidding of public contracts," a long-standing principle of Pennsylvania law, set forth first in *Harris v. Philadelphia,* 283 Pa. 496, 129 A. 460 (1925). Commonwealth Court then points out that "[p]rivate meetings and negotiations with some bidders to the exclusion of others before the contract is awarded is precisely the sort of favoritism and unfair advantage that Harris and its progeny disdained." *Stapleton, supra* at 540, 593 A.2d at 1331.

Reasons of public policy controlled the Commonwealth Court's decision not to require any bond at all in *Stapleton:* "to order that such security [$34,000,000] be filed in this case . . . would impose such a financial burden on taxpayers that it would discourage such actions." 140 Pa. Commw. at 542 n.17, 593 A.2d at 1332 n.17.

The Supreme Court denied allocatur, thereby recognizing, sub silentio, that a court has the discretion to require no bond where a taxpayer has an action against a governmental entity.

This is consistent with the long-standing rule in this country, and in Pennsylvania, that our courts are open to all, regardless of wealth. Taxpayers in particular must not be denied access to equitable relief against governmental entities by bond requirements that are insurmountable and which would only be appropriate where disputes strictly among citizens are involved. This is almost axiomatic and is rarely raised at all in appeals involving taxpayers' rights. The paucity of case law (the *Stapleton* footnote was all this court could find and the PAA has alluded to none) indicates how basic and largely undisputed the issue is.

The nominal bond imposed in the instant case was proper, especially where no existing contract was annulled and only prospective contracts were affected by the preliminary injunction.

## CONCLUSION

The limited language of the special legislation referring only to one part of the entire bidding process, the requirement of three written bids, does not provide an exemption from the pre-existing legislation which governs the entire bidding process. Furthermore, on the rare

occasions when similar exemptions *were* intended by the legislature, very clear and explicit language was used. In this case, the "note of evidence" filed by the PAA shows that stronger language which *expressly* referred to all phases of the bidding process was *deleted* from the Act prior to passage, further support for the finding that the legislature had an actual intent *not* to exempt the PAA from the bidding requirements set forth in the pre-existing legislation.

At the full trial of the instant matter, to which the parties are entitled after the pleadings are closed, the PAA will have ample opportunity to present more evidence, if any exists, in support of its contention. Right now, all the PAA has done, at best, is to raise the suspicion that the special legislation is really stealth legislation, possibly intended by some of its drafters to have a concealed exemptive effect, but highly unlikely to have been regarded by those who read it and voted on it as exempting multi-million dollar projects from the well-settled rules that would ordinarily safeguard the process of soliciting and awarding public contracts.

