# Meigs's Appeal.

1. During the rebellion, the United States erected barracks on the common of York, and afterwards converted them into a military hospital, adding other buildings. After the war, the government offered the buildings for sale, the buildings to be removed. *Held*, that the officers of the government could not be restrained from so doing.

2. In determining what is a fixture, the notion of physical attachment is exploded; it is now determined by the character of the act by which the structure is put into its place, the policy of the law connected with its purpose and the intention of those concerned.

3. The common had been granted to be kept as an open common for ever for the use of the borough, and for no other purpose, the borough authorities had therefore no power to assent to the erection as permanent fixtures, and it was their duty to prevent it if so intended.

4. The emergency, and all the acts of the government, show that these were not permanent buildings, but temporary, to be used during the continuance of the war, and whilst the necessities of the government made this location convenient for military purposes.

5. By suffering the United States to put the structures where, as permanent buildings, they would be nuisances, the borough is estopped from declaring that the United States intended to annex their chattels to the freehold and that they were tortfeasors, to be treated as dedicating their property to the public.

6. A license to use the land of another temporarily may be inferred from circumstances.

7. A permanent right to the use of structures built on the land of another, with his assent, may be acquired by the expenditure of money and labor.

8. A court of equity does not enforce penalties and forfeitures.

May 3d 1869.   Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ.   WILLIAMS, J., absent.

Appeal from the Court of Common Pleas of *York county:* In Equity: No. 105, May Term 1868.

This was a proceeding by the corporation of the borough of York, Pennsylvania, to restrain Montgomery C. Meigs, the quartermaster-general of the United States, George W. Bradley and others, from selling and removing certain buildings on the York Common, erected under the authority of the government and used for barracks and hospitals for the soldiers during the war of the rebellion.

The bill was filed July 30th 1866, by The Burgesses and Inhabitants of the Borough of York, against Montgomery C. Meigs, G. W. Bradley, Andreon and others, and David A. Wilhelm.   It set out: 1. That the plaintiffs were seised in fee of a tract of about 20 acres of land in the borough of York, known as the York Common, and were in peaceable possession of it until about January 1862, when certain persons claiming to be officers of the United States, took possession of it for camping grounds and barracks, and occupied it for two months and then abandoned it.   2. Afterward it was taken possession of by persons claiming to act under the authority of defendant Meigs, quartermaster-general of the United States, and was used as a military hospital.   3. No contract was ever made by the plaintiffs with the United States for the use of the common; the possession was taken without leave or consulting the plaintiffs, and it was occupied by the persons using it for their own purposes until voluntarily abandoned.   4. During the occupancy, permanent buildings were erected and are yet standing on the land, "being part of the land itself:" the erections were paid for partly out of public funds, and partly by voluntary contributions of the citizens of York and others.   5. Beside the loss of being kept out of their property, injury has been done to it which cannot be repaired except by a heavy expense.   6. No rent or compensation has been paid or agreed to be paid by the occupants.   7. Meigs, Bradley, his assistant, Andreon and others, auctioneers, and Wilhelm have threatened by speeches, and published in handbills and newspapers that they will sell the buildings erected on the

[Meigs's Appeal.]

land, on the 1st day of August 1866, and cause them to be removed and delivered to the purchaser, and thus do the plaintiffs the irreparable wrong of occupying their property for more than four years without compensation, and then destroying the buildings and carrying away the materials. The prayer was for an injunction to restrain the removal, and for general relief.

Meigs only answered. He averred: 1. The York Common had been conveyed to the plaintiffs by the proprietors of Springettsbury Manor, on the 11th of June 1816, "to be kept as an open common for ever, for the use of said borough and to and for no other use, intent or purpose whatsoever." 2. In January 1862, when the government was engaged in a public war, and it was necessary to provide barracks for troops and hospitals for sick and wounded soldiers, troops enlisted in the service of the government were ordered to York, and the barracks were constructed under proper military authority, and paid for out of the public funds of the United States; from the date of the conveyance until that time the common had been vacant and unenclosed. 3. The troops having been ordered off, the barracks remained unoccupied until June 4th 1862, when under order of the surgeon-general of the United States the barracks were fitted up for hospital purposes at the expense of the government. 5. The buildings were from time to time enlarged and new buildings erected as necessity required during the continuance of the war, and the expense paid by the United States except a chapel, which was paid partly by contributions of individual citizens, partly from the "slush fund" of the hospital, and the remainder from the funds of the United States. 6. The buildings continued to be used as a military hospital during the continuance of the war and until August 1865, when it was closed. 7. No contract was made by the government with the plaintiffs or any other person for the use of the land, no compensation has been paid for its use, no agreement or promise was made to pay for the use of the land, nor did the plaintiffs ever object to its occupation for barracks or hospital, or notify any of the officers not to enter upon it, or demand any compensation for it. 8. The buildings are still on the lot. 9. The buildings "were not erected on stone or other permanent foundations, but on wooden supports let into the soil, and were designed and so constructed for use and occupancy so long as occasion for quartering troops in said barracks, and accommodating sick and wounded soldiers in the military service of the United States in said war should exist, and no longer." 10. The defendant Meigs, as quartermaster-general, and by authority of the war department, before the filing of the bill, had ordered Bradley, a subordinate quartermaster, to sell the buildings which were then and continued to be in the custody and under guard of persons employed by the quartermaster's depart-

[Meigs's Appeal.]

ment, for the benefit of the United States, to have them removed from the land and to restore it to the vacant and unenclosed condition in which it was when appropriated, as before stated, by the government. Andreon and others, defendants in the bill, were auctioneers employed to make the sale, and Wilhelm was employed by the quartermaster to take care of the buildings.

A general replication was filed, and James W. Latimer, Esq., appointed examiner.

The evidence was that the buildings were on foundations as in common frame buildings; they were on posts dug into the ground about two feet; they were eight feet high on the low side; the church rather better than other frame buildings in York; the first buildings had board roofs, the later ones the best pine shingles; the buildings have no sills or stone foundations; there are no mortises or tenons, the timbers are sawed square and spiked together; buildings are not framed that way in York; boards unplaned, no plastering, the ceiling of boards; the buildings put up in the simplest and cheapest way, without cellars or chimneys.

The Court (Fisher, P. J.) decided as follows :—

"This case having been previously argued by counsel, the court is pressed for a decision to enable the parties to take the same to the Supreme Court, to be heard on the third day of May, at the time fixed for hearing the cases from the Nineteenth Judicial District. Without, therefore, examining the case, or preparing an opinion; but for the purpose of enabling the Supreme Court to decide it without any further delay, the Court make this *pro forma* decree.

And now, to wit:—April 28th 1868, the court do adjudge and decree that the said defendants have no right in law or equity to remove and carry away the buildings and materials in the said bill mentioned and described. And it is further decreed, that the said defendants, their servants, agents and alienees be strictly enjoined to desist and abstain from such removal of said buildings or the materials of which they are composed, and from intermeddling or interfering in any wise or in any manner with the use and enjoyment thereof by the said plaintiff."

Meigs appealed to the Supreme Court and assigned the decree for error.

*T. E. Cochran*, for appellant.—If there was a wrong, it had been done four years; the plaintiffs lay by and are now too late to obtain equitable relief: Hilliard on Injunction, p. 24, § 43; Tash v. Adams, 10 Cushing 253; Pittsburg v. Scott, 1 Barr 317; Welland Canal v. Hathaway, 8 Wendell 480; Corning v. Gould, 16 Id. 545; 2 Amer. L. C. 746–750. The plaintiffs cannot allege that they had no right to consent to the erection: Moran v. Miami, 2 Black 722. Injunction will not be granted unless under clear

necessity: N. Boston Coal Co. *v.* Pottsville, 4 P. F. Smith 164.
The United States had the right to occupy the ground: Const.
of the U. S. Art. 1, § 8, pl. 12, 13, 15–17, 19. War existed:
Prize Cases, 2 Black 670; Fifield *v.* Insurance Co., 11 Wright
166. There is a difference between permanent taking of private
property and temporary occupation: Van Horne *v.* Dorrance, 2
Dallas 304. The right to preserve the nation is inherent in its
sovereignty, and appropriate means may be used though not speci-
fied in the Constitution: Shollenberger *v.* Brinton, 2 P. F. Smith 9;
Brown *v.* United States, 8 Cranch 110; Sharpless *v.* Philadel-
phia, 9 Harris 147. Private property may be taken for public
use and compensation afterwards provided: Bonaparte *v.* Camden
& A. R. R., Baldwin 206, 226; 2 Kent's Com. 399, notes and cases
cited. Congress has provided for obtaining compensation in such
cases by the Court of Claims: Acts of February 24th, 1855, § 1,
1 Bright. U. S. Dig. 198, pl. 1; March 3d 1863, § 2, 7, 2 Id. 97,
pl. 2, 7.

*J. S. Black* (with whom were *M. S. Eichelberger* and *J. L.
Mayer*), for appellees.—The question of fixture depends upon
whether it is let into the soil. This is the case of a trespasser
erecting permanent buildings on another's land: he cannot remove
them. The government could not take the land without compen-
sation; besides, the right of eminent domain belongs to the state
exclusively. That it was desirable, proper and convenient that
the United States should have barracks and hospitals in time of
war may be conceded, but it was not more necessary than that
they should have clothes, guns, provisions, tents, munitions, &c.
The rule that private property cannot be taken without compen-
sation is the supreme necessity, and the "life of a nation" which
habitually violates it is not worth saving. The taking or destruc-
tion of private property can be excused only when it is *absolutely*
and *manifestly* necessary to meet some *immediate* danger, which
can be averted in no other way, or to deprive the enemy of some
*direct* advantage, which he would be sure to obtain: Mitchell *v.*
Harmony, 13 Howard 115. Estoppel exists only where the act
is done under a color or belief of right. The complaint is not of
what is past, but as to the future; the claim is, that an act should
not be repeated in time of peace, which even in war was without
justification. The President or commander-in-chief could not
confer authority on subordinates not warranted by law: Little *v.*
Barreme, 2 Cranch 179.

The opinion of the court was delivered, July 6th 1869, by
AGNEW, J.—The plaintiffs' bill evidently proceeded on the
ground of title. Its purpose was to restrain the agents of the
United States from removing the buildings erected on the public

common of York for military barracks and hospitals. These structures being put up by the United States for military purposes, and built of their own materials; the title to the materials must have been lost to the United States and vested in the plaintiffs before an injunction would be issued to restrain their removal. Hence the plaintiffs assume, that by the act of the United States, the buildings were annexed to the freehold; and thus the title to the materials passed out of them, and vested in the borough of York as trustees of the title to the common. The buildings were chiefly set upon posts let into the ground; and therefore the argument of the plaintiffs maintains that the question of fixture or not a fixture depends, not on the character of the foundation, but always on the question whether it is let into the soil. This is the old notion of a physical attachment, which has long since been exploded in this state. On the contrary the question of fixture or not depends on the nature and character of the act by which the structure is put in place, the policy of the law connected with its purpose, and the intentions of those concerned in the act. This subject has been so fully discussed in the recent case of Hill v. Sewald, 3 P. F. Smith 271, it is unnecessary to repeat what is there said.

The true question then is, Were these structures of the government incorporated into the realty? We think they were not, and this is manifested by the entire character of the transaction, and the attending circumstances. And in the first place it was not the intention of either party that they should be annexed to the freehold. Evidently the authorities of the borough of York cannot be presumed to have so intended. The grant from the proprietors of Springettsbury Manor to the burgesses and inhabitants of York of twenty acres of land was,—"to be kept as an open common for ever for the use of said borough, and to and for no other use, intent or purpose whatsoever." The borough authorities had no power to assent to such erections, as permanent fixtures, and it was therefore clearly their duty to prevent their erection, if intended as such. Having made no objection and taken no steps to prevent it, they are entitled to the more favorable construction of their acts, that they knew and believed they were only temporary structures, for a casual purpose.

As to the United States the emergency and all the acts and measures of the government show that these were not permanent buildings to be occupied at all times, but were mere temporary structures to be used during the continuance of the war, or so long only as the necessities of the government made this location convenient for military purposes. It is very evident the United States intended no annexation to the freehold.

The nature and character of the structures are also to be considered. They were not improvements made for objects connected

12 P. F. Smith—3

[Meigs's Appeal.]

with the soil—neither intended to give value to it, nor to receive value from it. Their purpose was not different from that of the tents spread for the accommodation of the army, or its board huts used for winter quarters, the only real difference being that these structures were intended for greater comfort, and a longer occupancy of the location.

The act is distinguishable from that of an ordinary trespasser. There was no intent to improve the ground, or to make it accessary to some business or employment. It was not an assertion of title in the soil, or of an intention to hold an adverse possession. Indeed there was not a single element in the case which characterizes the act of a tortfeasor, who annexes his structure to the freehold, and is therefore presumed to intend to change the nature of his chattel and convert it into realty, and thereby to make a gift of it to the owner of the freehold. Neither the borough nor the United States looked upon the act in that light. The United States intended no dedication of the materials to the borough, and the borough expected none.

Herein it is that in equity the same principles apply that lie at the root of an estoppel. It is not estoppel in the ordinary sense which prevents an owner from claiming his own property, because he has done that which shuts his mouth to declaring his title. These materials never were the property of the borough, and therefore as owners they had no title to be estopped of. But the borough, by lying by and suffering the United States to put up the structures without objection, on a public common, where, as permanent buildings, they would be nuisances, is estopped from declaring that the United States intended to annex their chattels to the freehold; from asserting that they were mere tortfeasors, to be treated as presumptively dedicating their property to the public. This, however, is the pivot on which the right to an injunction turns. The plaintiffs must convince us that in law and equity the United States have lost their title notwithstanding neither party intended there should be a gift of the chattels. They must stand in the attitude of one entitled in equity to appropriate these structures, and of whom it must be said he has done nothing to mislead or to encourage a belief that he has assented to the act. A license to use the land of another temporarily, may be inferred from circumstances. Thus a neighbor who enters to pay a visit cannot be treated as a trespasser. So a guest who enters an inn, or one who moors his vessel at a private wharf, to do business with the owner. And even a permanent right to the use of structures built on the land of another with his assent, may be acquired by the expenditure of money and labor: Lefevre *v.* Lefevre, 4 S. & R. 241; Rerick *v.* Kern, 14 S. & R. 267. And it is said in Cook *v.* Stearns, 11 Mass. 533: "Licenses to do a particular act do not in any degree trench on the policy of the law

[Meigs's Appeal.]

which requires that bargains respecting the title or interest in real estate shall be by deed or in writing. They amount to nothing more than *an excuse* for the act which *otherwise would be a trespass.*" See also notes to Rerick *v.* Kern, 2 Am. Lead. Cases 514. There is nothing in the case to show express license, but the circumstances bear strongly on the silence of the plaintiffs when they should have spoken out.. The United States were engaged in a gigantic war, requiring all its means and the encouragement of all good citizens to suppress the opposition to their welfare and authority. Troops were constantly required to be raised and disciplined. York was within the theatre of war, and needed protection, the enemy coming up to her very door. Battles were fought near by, and none more than the citizens of York needed that the government should use all the means and appliances of war to preserve their lives and property. Can it be tolerated that now, when the enemy is defeated, and war is no more, that these citizens should claim the very property the government had used as part of the means necessary to their protection? If equity has a conscience, it must revolt at this return for the services thus rendered by the common government.

This is an application to a court of equity, to use the arm of the law to restrain an unlawful act, on the ground that the removal of these buildings is an irreparable injury. But surely this is not such a case. There is not any evidence that the United States have dedicated this property to the citizens of York, or that they have done any act which can justly forfeit their title to the property; and it is not the province of a court of equity to enforce penalties and forfeitures. It is not necessary to invoke the power of eminent domain in this case, or any doctrines of necessity to override the rights of property. Equity will not interfere in such a case independently of these considerations.

The *pro forma* decree of the court below is reversed, and the plaintiffs' bill is dismissed at their costs.