Thomas S. WHITE, Mark G. Trombetta, M.D. Robert E. Faust, Leonard C. Highley and H. Scott Hawkins, Appellants,

v.

TOWNSHIP OF UPPER ST. CLAIR, Robert Crown, t/d/b/a Crown Communications, and Barbara Crown, his wife.

Commonwealth Court of Pennsylvania.

Argued Feb. 11, 2002.

Decided April 30, 2002.

Reargument Denied June 25, 2002.

Eugene J. Reinbold, Pittsburgh, for appellants.

Robert J. Wratcher, Pittsburgh, for appellees.

BEFORE: COLINS, President Judge, LEAVITT, Judge, and KELLEY, Senior Judge.

OPINION BY Judge LEAVITT.

Thomas S. White, Mark G. Trombetta, M.D., Robert E. Faust, Leonard C. Highley, and H. Scott Hawkins are residents (Residents) of Upper St. Clair Township (Township). Residents brought suit in the Court of Common Pleas of Allegheny County (Trial Court) to challenge the construction of a 350–foot high communica-

tions tower in Boyce Park, a public park located in the Township. Boyce Park was conveyed to the Township by the County of Allegheny (County) under a deed that limited the use of the property to recreation, conservation and historic purposes, and the Residents asserted that a communications tower was inconsistent with these deed restrictions. The Trial Court dismissed the complaint by a series of orders sustaining preliminary objections and granting summary judgment; these orders have been appealed to this Court.[1] We reverse in part and affirm in part.

## HISTORY OF THE CASE

Since its acquisition by the Township in 1985, Boyce Park has remained an undeveloped parcel of land. The park consists of approximately 200 acres of rolling hills, meadows, forest, and wetlands traversed by hiking trails; it serves as a preserve for wild flora and fauna. The Township's 1995 Comprehensive Plan designated Boyce Park for public recreation, which it described as "natural open space," and recited the Township's commitment to preserve its open space.

In 1995, a representative of Robert Crown t/d/b/a Crown Communications and Barbara Crown (collectively Crown) approached the Township about Crown's interest in constructing a communications tower in the Township. By August of 1995, Crown had fixed upon a location in Boyce Park for the project, which was next to an existing tower of 180 feet built in 1992 that provided the Township with certain emergency communications support.[2]

---

1. This Court's scope of review when considering a motion for summary judgment or a demurrer is limited to error of law or clear abuse of discretion. All well-pleaded material facts in the complaint and reasonable inferences that may be drawn from those facts must be accepted as true. *O'Brien v. Town-*

*ship of Ralpho*, 166 Pa.Cmwlth. 337, 646 A.2d 663 (1994).

2. This tower was removed as part of the construction of the 350 foot high tower at issue here; the validity of the 180–foot high tower is not the subject of this appeal.

Coincidentally, the Township decided that its existing emergency communications system was inadequate. Crown proposed to replace it in exchange for an easement in Boyce Park.

On April 1, 1996, the Board of Commissioners of the Township enacted Ordinance 1710 authorizing Township officials to complete negotiations with Crown for the construction of a state-of-the-art communications tower and to enter into a lease of Township realty for that purpose. Ordinance 1710 did not identify the Township realty under consideration for the lease. On May 6, 1996, the Board of Commissioners enacted Ordinance 1712 consisting of numerous amendments to the Zoning Code, one of which exempted the Township—and its lessees—from all provisions of the Zoning Code.[3]

On June 28, 1996, the Township entered into a lease agreement (Lease) with Crown for an initial term of 25 years with an option to renew for three successive terms. The Lease was for .428 acres of the approximately 200 acres that make up Boyce Park, and it obligated Crown[4] to install, maintain and operate a 350–foot high communications tower and to provide the Township a public communications system for 911, police, fire and emergency medical services. In addition to the tower, Crown was required to erect three adjoining buildings for equipment and to encircle the parcel with an eight-foot high cyclone fence topped with barbed wire. Finally, Crown was to pay the Township annual rent of $2500 for its occupancy of the .428 acres of Boyce Park with a possibility of a future rent increase if the Lease is extended into additional terms. Crown has stipulated that at the time of the execution of the Lease, it was aware of the deed restrictions relating to the uses for Boyce Park. (R.R. 433a).

Excavation and clearing of the property began in July of 1996, and on September 27, 1996, the tower was delivered to the site. By October 7, 1996, the tower reached a height of 200 feet, at which point regulations of the Federal Aviation Administration required that it be lighted. The tower then became noticeable to the Residents. By the end of October, the structure was complete. On November 8 and 10, 1996, two of the Residents, White and Trombetta, filed appeals with the Zoning Hearing Board claiming that the tower conflicted with the Township's R L1 Low Density Zoning District. After a hearing, the Zoning Hearing Board held that the protests were timely filed; that the tower violated the Zoning Code; that Ordinances 1710 and 1712 were improperly enacted; but that Crown had vested rights to continue its use of the property.[5]

On November 20, 1996, the Residents filed a five count complaint (Complaint) with the Trial Court seeking declaratory and injunctive relief to have the Lease

---

3. The amendments, save for the last one exempting Crown from the Zoning Code, related to parking and redefining "sexually-oriented business" for purposes of the Zoning Code. (Reproduced Record 178a–181a) (hereinafter "R.R.").

4. The fact that the Lease "obligated" Crown to construct the tower should not obscure Crown's commercial purpose in entering into the Lease. By January of 1999, Crown's list of tenants included: American Paging, Inc.; APT Pittsburgh Limited Partnership; Pittsburgh Cellular Telephone Co.; Bell Atlantic Mobile, Inc.; Mobile Comm of the Northeast, Inc.; Paging Network of Philadelphia, Inc.; Nextel Communications, Inc.; Sprint PCS; Township of Upper St. Clair; and USA Mobile, Inc. (R.R.435a).

5. Certain of these findings of fact and conclusions of law were vacated by the Court of Common Pleas of Allegheny County, which decisions have been appealed and are pending before the Pennsylvania Supreme Court.

declared null and void and to have the tower removed. Residents also sought alternative relief in the form of a writ of mandamus. The Township and Crown filed preliminary objections to the Complaint, asserting, *inter alia,* that the Residents lacked standing, that the Residents failed to state a cause of action (on grounds of laches, estoppel, waiver and inapplicability of a statute) and that the Court lacked subject matter jurisdiction.

On February 7, 1997, the Trial Court entered an order sustaining some of the preliminary objections and overruling others. From that point, the procedural history becomes a point-counterpoint series of filings that include: answers with new matter, an amended complaint, new preliminary objections, cross-motions for summary judgments, a motion for leave to amend the complaint and various motions for reconsideration. In the end, all five counts of the Complaint were dismissed. Four of the Trial Court's orders [6] are before us: the order of February 7, 1997, the order of June 24, 1998, the order of December 16, 1998, and the order of June 28,

2000. On June 11, 2001, the Trial Court entered a Statement in Lieu of Opinion.

The issues raised by Residents in their appeals to this Court are as follows: 1) whether their status as residents and taxpayers of the Township gives them standing to challenge the use of Boyce Park for purposes other than those specified in the deed; 2) whether Residents may compel the Township to make application under the Donated or Dedicated Property Act or enforce the Township's duty under the act; 3) whether the Township and Crown were required to file a subdivision and development plan pursuant to the Township Subdivision and Development Ordinance; and 4) whether the Township was required under its Home Rule Charter to use competitive bidding procedures in its acquisition of emergency communications service. Crown has participated in this appeal, but the Township has not.

### STANDING

In its order of February 7, 1997, the Trial Court held that the Residents had standing to challenge the alleged violations of the deed restrictions set forth [7] in

---

**6.** One of the Trial Court's orders was appealed to this Court by Crown but withdrawn when the Trial Court reversed itself on whether the Township could be compelled by a writ of mandamus to comply with the Subdivision and Development Ordinance of the Township.

**7.** The deed provided that the conveyance to the Township was made "so long as the property described below is used for recreation, conservation and historical purposes as defined in the Project 70 Land Acquisition and Borrowing Act, approved June 22, 1964, Pa. Stat. Ann. Tit. 72, § 3946.1 *et seq;* and the Land and Water Conservation Act [sic], Pa. Stat. Ann. Tit. 32, § 5101 *et seq . . . .*" (R.R. 19a).

The Project 70 Land Acquisition and Borrowing Act contains the following definitions:

"Recreation and historical purposes" means any use of land for public park, fishing, hunting, boating, open space pur-

poses or scenic sights or preservation of sites or historical purpose.

"Conservation purposes" means any use of land for water supply, flood control, water quality control development, soil erosion control, reforestation, wild life reserves or any other uses that will maintain, improve or develop the natural environment of soil, water, air, minerals or wild life of this Commonwealth so as to assure their optimum use.

Section 3(1) and (2) of the Project 70 Land Acquisition and Borrowing Act, Act of June 22, 1964, P.L. 131, 72 P.S. § 3946.3(1) and (2). Section 3 of the Land and Water Conservation and Reclamation Act contains identical definitions; however, the second definition defines a slightly different term, *i.e.,* "conservation and reclamation purposes." 32 P.S. § 5103(2).

Count I of their Complaint. Subsequently, in its order of June 28, 2000, the Trial Court reversed itself, holding that the deed created a charitable trust that could be enforced by the Attorney General or by a person with a special relationship to the trust but not by the Residents, whose interests were found not to be sufficiently "special." In their appeal, Residents contend that their interests as residents and taxpayers are sufficient to confer standing but, in any case, standing can certainly be found in their allegation of reduced property values caused by the nearby, unsightly tower,[8] which allegation the Trial Court refused to allow by amendment to the Complaint in its June 28, 2000 order. Residents also charge that the Trial Court violated the "law of the case" doctrine by reversing itself on the issue of standing, when no new facts had emerged to justify this reversal.

To do its standing analysis,[9] the Trial Court relied upon case law precedent where members of the public have sought to amend, or to preserve from change, the terms of a charitable trust established by private persons. These include *Wiegand v. Barnes Foundation*, 374 Pa. 149, 97 A.2d 81 (1953) (wherein an editor of the *Philadelphia Inquirer* sought to increase the hours of public access to the Barnes Foundation's art gallery) and *Valley Forge Historical Society v. Washington Memorial Chapel*, 493 Pa. 491, 426 A.2d 1123 (1981) (wherein the society sought to continue its right to occupy the chapel). Each case analyzed the question of standing and

held firm to the principle that a member of the general public lacks standing to enforce a duty owed by a charitable organization. The reason is that if one individual may interpose in a private charity's operation, another may to the contrary, and there would be no end to litigation and strife.[10] At issue here, however, is a public park. The standing analysis is different in cases where citizens seek to protect a park, a town square or other land dedicated to a particular public purpose from degradation or intrusion by an inconsistent public or private use. It is that body of case law that provides the appropriate authority in this case.

■ Real property may be dedicated[11] to public use in a variety of ways. Dedication may be express or it may be implied from the acts of the parties, and it need not take a particular form. Dedication may be found in a single act, such as the giving of a deed or the recording of a plan, or it may be found from a series of acts, all consistent with and pointing to the intention to dedicate. Dedication, like a contract, requires both offer and acceptance, and once there is acceptance, in whatever form it takes, dedication is irrevocable. *Borough of Ridgway v. Grant*, 56 Pa. Cmwlth. 450, 425 A.2d 1168, 1170 (1981).

Here, the dedication of Boyce Park is apparent from the acts of the County and of the Township. The County conveyed 200 acres of land to the Township so long as the property was used for recreation,

---

**8.** The Residents characterize the tower as having the appearance of an industrial structure. In addition to its height, Residents object to its massive size. The triangular base at ground level measures 36 feet between each upright.

**9.** This is the third (and final) standing analysis set forth in its June 11, 2001 Statement in Lieu of Opinion.

**10.** *Estate of Nevil*, 414 Pa. 122, 129, 199 A.2d 419, 423 (1964).

**11.** *See* GEORGE G. BOGERT & GEORGE T. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 34 Rev.2d Ed. (1984) and 12 P.L.E. *Dedication* §§ 1–34 (1985).

conservation and historic purposes and required those restrictions to be recorded in the deed of conveyance. When the Township paid the County $1.00 to receive the conveyance, it accepted the terms of the dedication, and the dedication became irrevocable. The dedication can be found in the restrictions recorded in the deed, and it can be found expressed in the Township's Comprehensive Plan of 1995.

While the dedication of Boyce Park may be described as a trust, it is not a technical trust.[12] BOGERT explains the difference.

> While many cases and statutes describe the municipality as holding the dedicated land in trust, *it is believed that the word "trust" is used in a non-technical sense, as denoting merely an obligation arising out of the acceptance of the dedicated property, and not as meaning that the city became a trustee for charitable purposes.*
>
> *It is commonly accepted that any taxpayer can proceed in equity to enjoin the waste, destruction, misuse, or abuse of the property* of a municipal corporation. Many of the suits against munici-

palities to compel the application of dedicated land to the special purpose for which it was dedicated are brought by taxpayers as such, on the usual theory of improper use of public property and consequent financial loss to the taxpayers. Equity takes jurisdiction because of the inadequacy of the remedy at law, and not because of any trust.

BOGERT, *supra* § 34, at 408–409 (emphasis added). In *Borough of Ridgway,* this Court described the dedication of land to a public park as a "charitable trust," but it went on to apply land dedication case law. 425 A.2d at 1170. In short, while it was not error for the Trial Court to call the legal arrangement by which Boyce Park was created a "charitable trust," it was error to treat it as a technical trust or charity to which the principles announced in *Estate of Nevil* would apply.

■ When the Township decided that the dedication of the .428 acres in question no longer served the public interest, it had recourse. Under Section 4 of the Donated or Dedicated Property Act, Act of December 15, 1959, P.L. 1772, 53 P.S. § 3384,[13]

---

**12.** Crown directs our attention to BOGERT's observation that cases are rare where persons other than the Attorney General have been able to challenge the operation of a charitable trust. BOGERT, *supra* § 414, at 51. This section of BOGERT is irrelevant because it addresses private charities, such as the Barnes Foundation at issue in *Wiegand,* not the use of land dedicated to public purposes.

**13.** Section 4 of the Donated or Dedicated Property Act states:

> When, in the opinion of the political subdivision which is the trustee, the continuation of *the original use of the particular property held in trust as a public facility is no longer practicable or possible and has ceased to serve the public interest,* or where the political subdivision, as trustee for the benefit of the public, is in doubt as to the effectiveness or the validity of an apparent dedication because of the lack of a record of the acceptance of the dedicated land or buildings, *the*

> *trustee may apply to the orphans' court of the county in which it is located for appropriate relief.*
>
> The court may permit the trustee to—
> (1) Substitute other lands or property of at least equal size and value held or to be acquired by the political subdivision in exchange for the trust property in order to carry out the trust purposes.
> (2) If other property is not available, sell the property and apply the proceeds to carry out the trust purposes.
> (3) In the event the original trust purpose is no longer practicable or possible or in the public interest, *apply the property* or the proceeds therefrom in the case of a sale *to a different public purpose.*
> (4) Relinquish, waive or otherwise quitclaim all right and title of the public in and to such land and buildings as have been apparently dedicated but for which no formal acceptance appears of record: Provided, only, That the court is satisfied upon hear-

the Township was free to apply to orphans' court for approval to apply the property to a different public purpose. In the absence of this application, and a court order of approval for another use, the Township was obligated to ensure that the use of the .428 acres of Boyce Park at issue here was consistent with a recreation, conservation or historical purpose.

Indeed, under Pennsylvania law, the Township's obligation to uphold the dedication is absolute, not discretionary. A political subdivision lacks authority to assent to the use of public land for any purpose—even a public purpose—other than the intended purpose, no matter how exigent the circumstances. In *Meig's Appeal,* 62 Pa. 28 (1869), our Supreme Court held that the Borough of York had no power to "assent" to the erection of federal military barracks and hospitals on the York Common during the "war of rebellion" and, to the contrary, that it was the duty of the Borough to prevent their erection. In an appeal of an injunction issued to prevent the City of Pittsburgh's effort to sell a dedicated public square, known as Diamond Square, our Supreme Court held

> The applicable principle of law is well stated in 3 Dillon, Municipal Corporations, 5th Ed., Sec. 1102: "A municipal corporation has *no implied or incidental authority to alien, or to dispose of for its own benefit, property dedicated to or held by in trust for the public use or to extinguish the public uses in such prop-*

erty, *nor is such property * * * [or the* proceeds of sale thereof available for] the payment of the debts of the municipality."

This has been the law of Pennsylvania for over a century.

*Hoffman v. City of Pittsburgh,* 365 Pa. 386, 391, 75 A.2d 649, 651 (1950) (footnotes and citations omitted) (emphasis in original). Not only is the sale of dedicated public land prohibited, so is the lease of dedicated public land. A municipality has been found to lack authority to lease dedicated public property to private concerns where the lease would be inconsistent with the terms of the dedication.[14] *Ormsby Land Co. v. City of Pittsburgh,* 276 Pa. 68, 119 A. 730 (1923). The question, then, is what persons have standing to enforce the terms of a dedication.[15] This has been directly addressed by our appellate courts.

In *Board of Trustees of Philadelphia Museums v. Trustees of University of Pennsylvania,* 251 Pa. 115, 96 A. 123 (1915), our Supreme Court considered the question of standing to enforce a dedication and found it to lie in citizens and taxpayers. By enactment of several ordinances, the City of Philadelphia had dedicated certain tracts of land to be used as gardens and park, free to the public at all times, on which lands museums were built. Subsequently, the City of Philadelphia repealed these ordinances in order to convey these lands, subject to an easement on

---

ing the evidence that there is no acceptance by implication arising out of public user or otherwise, the court shall also determine the consideration, if any, to be paid to the political subdivision.

53 P.S. § 3384 (emphasis added).

**14.** A lease consistent with a park's use, such as a concession stand or open air auditorium, can be permissible.

**15.** It is clear that the Attorney General can enforce the terms of a dedication, but as has been pointed out by BOGERT:

> And yet in the dedication cases it is rare that the Attorney General has appeared as a plaintiff or that the court has refused the private plaintiff relief on the ground that the Attorney General was the only party plaintiff.

BOGERT, *supra* § 34, at 410. We have been unable to find a Pennsylvania dedication case instituted by the Attorney General.

behalf of the museums, to the University of Pennsylvania. The Supreme Court held that "taxpayers and citizens" had standing to bring a suit in equity to nullify the sale of dedicated public property to a private institution, even a charitable non-profit institution. It reasoned that because the city had

> ... appropriated money for the care, maintenance and improvement of at least portions of the land in question, *every citizen and taxpayer has an interest, not only by virtue of his being one of the public to whom the property has been donated, but also by virtue of his contribution* as a taxpayer towards the funds, which have been used in improving the ground. A sale of the property, if improper, is therefore a question in which taxpayers have an interest and which they have a right to contest.

*Id.* at 122–23, 96 A. at 125 (emphasis added).

In *Payne v. Kassab*, 11 Pa.Cmwlth. 14, 312 A.2d 86 (Pa.Cmwlth.1973), this Court conducted a hearing on the request of citizens of the City of Wilkes–Barre and students attending Wilkes College in Wilkes–Barre to enjoin the taking of one-half acre of a city park, known as River Common, for the purpose of widening of two city streets. This court held that "[t]he *plaintiffs in this action have standing as part of the public and as owners of property fronting the Common to object* to the appropriation of part of the Common for highway purposes." *Id.* at 97 (emphasis added).[16] It is notable that standing was not limited to taxpayers (as owners of property) but also included "members of the public."

Persons with standing to participate in a legal proceeding brought under a zoning ordinance were found to have standing to proceed in equity when that statute was bypassed. In *City Council of the City of Pittsburgh v. City of Pittsburgh*, 155 Pa. Cmwlth. 328, 625 A.2d 138 (Pa.Cmwlth. 1993) this Court held that individual residents and members of City Council had standing to enjoin construction of fire stations by the City where the City had bypassed conditional use applications required under City Ordinance. It reasoned that since neighbors "who live in close proximity to a proposed use have standing as aggrieved persons to challenge zoning decisions," they have standing to bring suit in equity where zoning processes were bypassed. *Id.* at 336, 625 A.2d 138.

Residents cite three leading cases where citizens filed suits in equity to enforce the terms of a dedication, and their standing to do so was not challenged. They are *Bernstein v. City of Pittsburgh*, 366 Pa. 200, 77 A.2d 452 (1951) (where the construction of an open air auditorium in Schenley Park was challenged); *Borough of Ridgway*, (where the construction of a fire station in a park was challenged); and *Appeal of the Borough of Bangor*, 130 Pa.Cmwlth. 143, 567 A.2d (1989) (where construction of a school in a park was challenged).[17] Crown dismisses the cases as having little weight because the issue of standing was not litigated. The likely explanation for this fact is that the defendants recognized the weight of authority in dedication cases (discussed above) where standing has been liberally conferred. *Bernstein, Ridgway* and *Bangor* support the conclusion that

---

16. This Court found that the taking was consistent with the public purposes recited in the statutes by which the property was dedicated.

17. *Borough of Ridgway* and *Borough of Bangor* also stand for the principle that even an

important public purpose, such as building a school or a fire station, will not justify a municipality's abandonment of the terms of a dedication.

Residents have standing to pursue their claim that the use of .428 acres of Boyce Park as contemplated by the Lease is not consistent with the terms of dedication set forth in the deed.

■ Residents also challenge the Trial Court's reversal of its first decision on standing,[18] asserting that relitigation of the standing issue violated the "law of the case" doctrine. Strictly speaking, that doctrine only applies to appellate courts. However, a similar doctrine applies to trial courts, and it provides that a trial judge may not overrule an interlocutory order of another judge of the same court on an issue previously litigated in the same case. *Sanchez v. Philadelphia Housing Authority,* 148 Pa.Cmwlth. 329, 611 A.2d 346, 348 (1992). *Commonwealth v. Starr,* 541 Pa. 564, 664 A.2d 1326 (1995). It is not clear that this rule prevents a trial judge from reversing his own decision, but since we decide the standing issue in favor of Residents, we need not decide whether it was appropriate for the trial judge to reverse his own order in the absence of a motion for reconsideration.

Finally, we address the Trial Court's decision not to permit an amendment of Residents' Complaint with averments that their real estate has been devalued by the presence of the Crown tower. It appears that with these averments, Residents seek to enforce the deed restrictions by asserting a private property right in the nature of an equitable easement. BOGERT, *supra*

§ 34, at 409–410; *Appeal of Grille,* 181 Pa.Super. 456, 124 A.2d 659 (1956).[19] It may be that the proximity of their property to Boyce Park is such that Residents have an equitable easement that is enforceable in equity. However, we need not decide this issue since we find that Residents' status as residents and taxpayers gives them the requisite standing to pursue their claims in Count I of the Complaint against the Township and Crown.

We hold that Residents meet the test for standing set forth in *William Penn Parking Garage, Inc. v. City of Pittsburgh,* 464 Pa. 168, 346 A.2d 269 (1975). Their interests as taxpayers and residents of the Township are substantial, direct and immediate thereby conferring on them standing to pursue their claim that the Township has failed to uphold the terms of the dedication of Boyce Park. In *William Penn Parking,* our Supreme Court held that an interest may confer standing even if it is not a pecuniary one. *Id.* at 193, 346 A.2d at 280. The interests sought to be protected here are the preservation of Boyce Park to its intended recreation, conservation and historical purposes; these additional interests of Residents are specifically protected by the Pennsylvania Constitution. Article I, Section 27 of the Pennsylvania Constitution provides as follows:

> The people have a right to clean air, pure water, and to the *preservation of the natural, scenic, historic and esthetic*

---

**18.** In its February 7, 1997 order, the Trial Court held that the Residents had standing and affirmed that ruling in an order dated June 25, 1998. It later reversed itself in an October 6, 1999 order, in which it granted defendant's motion for summary judgment on Count I. It then granted Residents reconsideration of that order, but in its June 28, 2000 order, it held, again, that Residents lack standing.

**19.** In *Appeal of Grille,* the Superior Court held that deed restrictions can be enforced by neighboring land owners if it can be found that they are beneficiaries of the restrictions. The Court reasoned that a "restriction imposed for the benefit of the other party creat[es] an equitable right in the nature of an easement in his behalf [and] may be enforced in equity without regard to whether it is inserted by way of condition, covenant, or otherwise." *Id.* at 464, 124 A.2d at 664.

*values of the environment.* Pennsylvania's public natural resources are the common property of all the people, including generations to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

PA. CONST. I, § 27 (emphasis added). Standing to enforce the particular terms of the dedication of Boyce Park must be considered in light of Article I, Section 27; accordingly, standing, as in *Payne v. Kassab,* can be found in persons that are "part of the public" that enjoy the conservation, recreation and historic uses of Boyce Park.[20]

## DONATED OR DEDICATED PROPERTY ACT

In its February 7, 1997 order, the Trial Court sustained the demurrer of the Township and Crown to Count II of the Complaint, by which Residents seek to have the Township held liable for its alleged violation of the Donated or Dedicated Property Act, 53 P.S. §§ 3381–3386. Residents appeal, contending that the Act imposes a duty on the Township to ensure that Boyce Park is used for the purposes set forth in the deed unless and until it obtains court approval of other uses. They assert that since the Township did not make this application, its statutory duty may be enforced by the Residents and, further, the Township can be ordered by writ of mandamus to make application to have the .428 acres in question approved for other use.[21] Crown argues, in defense

of the Trial Court's decision, that Residents do not have a private right of action to enforce the Donated or Dedicated Property Act. We affirm in part and reverse in part the Trial Court's dismissal of Count II.

The Donated or Dedicated Property Act clarifies the legal status of certain lands, held by a political subdivision, that are dedicated to a public use. It states:

All lands or buildings heretofore or hereafter donated to a political subdivision for use as a public facility,[22] or dedicated to the public use or offered for dedication to such use, *where no formal record appears as to acceptance by the political division,* as a public facility and situate within the bounds of a political subdivision, regardless of whether such dedication occurred before or after the creation or incorporation of the political subdivision, *shall be deemed to be held by such political subdivision, as trustee, for the benefit of the public with full legal title in the said trustee.*

Section 2 of the Donated or Dedicated Property Act, 53 P.S. § 3382 (emphasis added). The statute creates a duty in the political division holding lands for use as public facility; it states

All such lands and buildings held by a political subdivision, as trustee, *shall be used for the purpose or purposes for which they were originally dedicated or donated, except insofar as modified by court order* pursuant to this act.

Section 3 of the Donated or Dedicated Property Act, 53 P.S. § 3383. It specifies

---

**20.** We recognize that because Residents have standing as taxpayers and residents, this analysis is not necessary to the holding. However, this analysis is appropriate wherever the terms of a public dedication are mirrored, almost word-for-word, in Article I, Section 27, as is the case here.

**21.** See Section 4 of the Donated or Dedicated Property Act, 53 P.S. § 3384, the language of which is set forth above at footnote 13.

**22.** A "public facility" is defined as "any park, theatre, open air theatre, square, museum, library, concert hall, recreation facility or other public use." Section 1(5) of the Donated or Dedicated Property Act. 53 P.S. § 3381(5).

the procedure for obtaining such a court order,[23] giving the court the specific "power to remove a restrictive covenant ... where ... the use of the property 'is no longer practicable or in the public interest.'" *Petition of Borough of Westmont,* 131 Pa.Cmwlth. 530, 570 A.2d 1382 (1990).

The Trial Court was correct in holding that the Donated or Dedicated Property Act creates a mechanism by which political subdivisions may terminate a dedicated use of a public facility, but it does more. It also creates a duty in the political subdivision to maintain the public facility in accordance with the terms of the dedication. Section 3 of the Donated or Dedicated Property Act, 53 P.S. § 3383.

The Act does not specify what persons may enforce the duty set forth in Section 3. This contrasts, for example, with the Project 70 Land Acquisition and Borrowing Act, Act of June 22, 1964, P.L. 131, *as amended,* 72 P.S. §§ 3946.1 and 3946.22. Section 20(e) of the Project 70 Land Acquisition and Borrowing Act provides that lands acquired under the act are to be used for recreation, conservation and his-

torical purposes, and if the political subdivision fails in this duty, it may be required to reimburse the Commonwealth the funds used to acquire the land. It identifies the party that may enforce this duty as follows:

(e) The Commonwealth of Pennsylvania may specifically enforce the provisions of this requirement by application to a court of equity or may invoke other remedies deeded appropriate under the circumstances.

72 P.S. § 3946.20(e). In *Quirk v. Schuylkill County Municipal Authority,* 54 Pa. Cmwlth. 619, 422 A.2d 904 (1980), this Court reviewed this language and concluded that only the Commonwealth of Pennsylvania, not private persons, could initiate proceedings to enforce the Project 70 Land Acquisition and Borrowing Act.[24]

In the Donated or Dedicated Property Act, the legislature did not specify the manner of enforcement of the Section 3 duty imposed on a political subdivision. If the Township had made application under Section 4 to obtain a court order allowing a use for Boyce Park other than the ones

23. This procedure is set forth in Sections 4 and 5 of the Donated or Dedicated Property Act. The text of Section 4 is set forth in footnote 13. Section 5 provides as follows:
In all proceedings under this act, the political subdivision shall give at least ten days' notice of the filing of its petition to the Attorney General who may become a party thereto and shall give notice to the public of the proposed date of the hearing, by publication, once a week for three successive weeks in the official legal journal of the county and in a newspaper of general circulation in the municipality, if there be one, or, if not, in a newspaper of general circulation in the county. *Any resident* of the political subdivision or any group or organization of residents of the political subdivision or any group or organization of residents of the political subdivision *shall have the right to file a protest and, in the discretion of the court, shall be entitled to be heard*

*in person or by counsel or to intervene in such action and to be a party thereto.*
Section 5 of the Donated or Dedicated Property Act, 53 P.S. § 3385 (emphasis added).

24. Crown improperly conflates the Donated or Dedicated Property Act with the Project 70 Land Acquisition and Borrowing Act. There is no reason to believe that the Township's acquisition of Boyce Park, for $1.00, involved funding under the Project 70 Land Acquisition and Borrowing Act. The deed incorporated two definitions from the Project 70 Land Acquisition and Borrowing Act to clarify what was meant by the dedication to "recreation, conservation and historic purposes." Identical definitions also appear in the Land and Water Conservation and Reclamation Act, which were also incorporated into the deed. Incorporating statutory definitions into a deed does not make those statutes generally applicable.

specified in the deed, the Residents would have been able to file a protest and seek to intervene in the orphans' court proceeding conducted under Section 5 of the Donated or Dedicated Property Act. It is only logical that where, as here, the application procedure has been bypassed[25] by the Township that the Residents should be able to proceed in equity to determine whether the Township has failed in its duty under Section 3.

*Quirk,* upon which Crown relies for its contention that private persons may not enforce the Donated or Dedicated Property Act is inapposite. As noted, *Quirk* deals with a different statute that expressly reserved enforcement to the Commonwealth. By contrast, the Donated or Dedicated Property Act is silent on enforcement of the duty set forth in Section 3.

The Trial Court believed that this Court's holding in *Petition of Borough of Westmont,* supported its conclusion that a private right of action does not lie under the Dedicated or Donated Property Act, but *Westmont* is also inapposite. First, *Westmont* arose from two statutes: the Donated or Dedicated Property Act and the Pennsylvania Inalienable Property Act,[26] and it was not clear which statute had been applied by the trial court. Second, the issue decided was whether the trial court had authority under the Donated or Dedicated Property Act to remove one deed restriction and impose a new use restriction. Standing to object to the removal of a deed restriction does not necessarily mean that the party will have standing to object to the new restriction. Third, while this Court stated *in dictum* that "the

standing of the parties under the Donated or Dedicated Property Act is not clear,"[27] it allowed neighbors, who intervened in the trial court proceeding, to appeal the trial court's decision.

This is not to say that private persons, or even the Commonwealth, can compel a political subdivision to make an application pursuant to Section 4 of the Donated or Dedicated Property Act by writ of mandamus. It is within the Township's discretion to seek court approval or not. If it does not, it runs the risk of being the target of an equity action brought to enforce a dedication, such as has occurred here. Had the Township made application under the Act and obtained court approval for a use other than that specified in the deed, it would have been shielded from Counts I and II of the Complaint.

In short, we hold that Residents have a private right of action to enforce the mandatory duty set forth in Section 3 of the Donated or Dedicated Property Act. To enforce this statutory duty, however, is to do no more than enforce the Township's duty under the deed. The statutory duty is redundant of the common law duty, and its enforcement does not entitle Residents to relief beyond that which may be obtained under Count I.

### "SUBDIVISION" AND "DEVELOPMENT" OF BOYCE PARK

■ Residents contend in Count III of their Complaint that the Lease constitutes a "division" of the 200 acres that makes up Boyce Park and a "development" of the

---

**25.** This was the logic followed by this Court in *City Council of the City of Pittsburgh v. City of Pittsburgh, supra.*

**26.** 20 Pa.C.S. §§ 8301–8306.

**27.** The Court did not explain why standing was not clear, and it may be nothing more than an acknowledgement that the grant of intervention and party status to a particular individual is discretionary with the trial court.

.428 acres on which the tower stands. In addition to the tower and equipment buildings, Crown has constructed a twenty-foot wide road, one-quarter mile long, to provide access to the leased parcel. Residents contend these changes in the use of the land required filings with and approval by the Township's Planning Commission pursuant to the Township Subdivision and Land Development Ordinance (Ordinance). Initially, the Trial Court agreed and granted Residents' motion for summary judgment and issued a writ of mandamus to the Township and to Crown to comply with the Ordinance. Subsequently, on December 16, 1998, the Trial Court dismissed Count III. We reverse the Trial Court's dismissal of Count III.

In *Cassidy v. Ginter, Inc.,* 6 Pa.Cmwlth. 430, 296 A.2d 293 (1972), this Court held that mandamus was the appropriate remedy where it is alleged that a borough has improperly denied a building permit.[28] In that case, the landowner was denied a permit to construct twenty-four apartment units on the stated ground that he had failed to comply with the borough's subdivision ordinance. This Court reviewed the definitions in the ordinance and concluded that the development of the tract did not constitute a subdivision, stating "[i]n our opinion, the definitional sections control

the intended scope of the ordinance." *Id.* at 294.

In *Tu–Way Tower Co. v. Zoning Hearing Board of Township of Salisbury,* 688 A.2d 744 (Pa.Cmwlth.1997), the Tu–Way Tower Company (Tu–Way) appealed the trial court's affirmance of the Zoning Hearing Board's denial of a variance needed to raise the height of an existing communications tower and to build two new towers and accessory buildings because they did not satisfy the requirements of certain pending amendments to the zoning ordinance. Under the "pending ordinance doctrine" a permit may be refused where it would be prohibited under a pending amendment to the zoning ordinance, but under the Pennsylvania Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. §§ 10101–11202, the doctrine may not be applied to an application for a "land development" or "subdivision." At issue, then, was whether the applications submitted by Tu–Way could be characterized as requests for permits to "develop" or "subdivide" land within the meaning of the MPC. This Court held they were not and upheld the Zoning Board's decision.

In doing so, this Court followed the approach developed in *Cassidy v. Ginter, Inc.:* it reviewed the definitions in the MPC[29] to determine its intended scope.

---

**28.** The corollary should also hold true. If a Township and its lessee are required to obtain certain permits and do not, they can be compelled by mandamus to do so.

**29.** Section 107 of the MPC, 53 P.S. § 10107, defines "land development" as follows:

(1) The improvement of one lot or two or more contiguous lots, tracts or parcels of land for any purpose involving:

(i) a group of two or more residential or nonresidential buildings, whether proposed initially or cumulatively, or a single nonresidential building on a lot or lots regardless of the number of occupants or tenure; or

(ii) the division or allocation of land or space, whether initially or cumulatively, between or among two or more existing or prospective occupants by means of, or for the purpose of streets, common areas, leaseholds, condominiums, building groups or other features.

(2) A subdivision of land.

(3) Development in accordance with section 503(1.1).

Section 107 of the MPC, 53 P.S. § 10107, defines "subdivision" as follows:

[t]he division or redivision of a lot, tract or parcel of land by any means into two or more lots, tracts, parcels or other divisions of land including changes in existing lot

It held, first, that Tu–Way's project was simply a reuse of its land, not a division or redivision, and, therefore, it did not constitute a subdivision within the meaning of the MPC. Next, it held that neither construction of accessory buildings nor the planned "lease" of space on Tu–Way's tower constituted a "land development." This Court found that Tu–Way's conveyance of antenna space on its tower to be a license, not a lease within the meaning of the MPC.

The definitional language in the MPC and in the Ordinance are almost identical.[30] We are bound by the interpretation of the terms "subdivision" and "land development" set forth in *Tu–Way*. However, the facts to which these definitions apply are different. Tu–Way did not divide the twelve acres of land that it owned but only reused it. It did not "subdivide" a vertical tower by a series of "leases" but simply licensed antenna space. Here, Residents

do not assert that Crown's licenses to "tenants" are leases giving rise to subdivision. Rather, they contend that the Lease, which conveys the use of a discrete parcel of land from the Township to Crown for up to 100 years, creates a subdivision. They are correct. The Lease divides a 200–acre parcel, Boyce Park, "for the . . . immediate . . . purpose of lease" of .428 acres to Crown. TOWNSHIP OF UPPER ST. CLAIR, Code § 114.10.45. This action creates a subdivision[31] within the meaning of the MPC and the Ordinance.

Based on the facts in the Complaint, we hold that the Township has subdivided Boyce Park for the purpose of the Lease. Accordingly, Residents state a cause of action under Count III of their Complaint. We do not decide whether they are entitled to the relief requested under Count IV, which was also dismissed by the Trial Court. Both Counts III and IV advance

lines for the purpose, whether immediate or future, of lease, partition by the court for distribution to heirs or devisees, transfer of ownership or building or lot development: Provided, however, That the subdivision by lease of land for agricultural purposes into parcels of more than ten acres, not involving any new street or easement of access or any residential dwelling, shall be exempted.

30. The *Township Subdivision and Land Development Ordinance*, defines "subdivision," as follows:

> *The division* or re-division *of a lot*, tract or parcel of land by any means into two (2) or more lots, tracts or parcels or other divisions of land, including changes in existing lot lines, *for the purpose*, whether immediate or future, *of lease*, partition by the court for distribution to heirs or devisees, transfer of ownership or building or lot development; provided, however, that the subdivision by lease of land for agricultural purposes into parcels of more than ten (10) acres, not involving any new street or easement of access or residential dwellings, shall be exempted.

TOWNSHIP OF UPPER ST. CLAIR, Code § 114.10.45 (emphasis added).

The Township Subdivision and Land Development Ordinance defines "land development" as follows:

> The improvement of one lot or two or more contiguous lots, tracts or parcels of land for any purpose involving:
> 114.10.24.1.1. a group of two or more residential or nonresidential buildings, whether proposed initially or cumulatively, or a single non-residential building on a lot or lots regardless of the number of occupants or tenure; or
> 114.10.24.1.2. the division or allocation of land or space, whether initially or cumulatively, between or among two or more existing or prospective occupants by means of, or for the purpose of streets, common areas, leaseholds, condominiums, building groups or other features.
> 114.10.24.2 *a subdivision of land;*

TOWNSHIP OF UPPER ST. CLAIR, Code, §§ 114.110.24.1 114.10.24.2 (emphasis added).

31. It appears that the subdivision is also a development under the definition at TOWNSHIP OF UPPER ST. CLAIR, Code, § 114.10.24.2.

the same legal theory, *i.e.*, violation of the Ordinance. In light of our holding that Residents state a cause of action for alleged violation of the Ordinance, the merits of both counts should be considered on remand.[32]

### HOME RULE CHARTER

■ In Count V, Residents charge that the Lease between the Township and Crown violated the competitive bidding procedures of its Home Rule Charter. Relying on this Court's holding in *Gaab v. Borough of Sewickley*, 692 A.2d 643 (Pa. Cmwlth.1997), the Trial Court dismissed this final count. We reverse.

Chapter 25 of the Township of Upper St. Clair Home Rule Charter provides that all contracts be competitively bid. It states as follows:

> Except as otherwise provided in this Charter, no contract for supplies, material, labor, franchise, or other valuable consideration, *to be furnished to or by the township*, shall be authorized on behalf of the township, except with the *best responsible bidder after competitive bidding*.

302 Pa.Code § 25.10–1002 (emphasis added). It also provides limited exceptions to the competitive bidding requirements. It states:

Competitive bidding shall not be required under this charter for:

\* \* \*

(5) Contracts relating to the acquisition or use of real property.

(6) Contracts for professional or unique services.

302 Pa.Code § 25.10–1004.

Residents assert that when the Township decided that it needed new emergency communications service, it was the duty of the Township to seek the "best responsible bidder" for that job. Instead, it obtained the services from Crown without any competitive bids from other responsible providers of these services.[33]

The Trial Court relied upon this Court's holding in *Gaab v. Sewickley*. This case involved a lease agreement remarkably similar to that at issue here. Under the lease with the Borough of Sewickley, Crown also provided the borough with police, fire, public works and 911 communications system; a microwave link from the tower to the borough building; maintenance and inspection; and electricity for the borough equipment and paid annual rent of $2,400 to be increased by 3% each year.[34] Certain residents appealed from the trial court's grant of summary judgment to the Borough of Sewickley and Crown. On appeal, Appellants asserted,

---

**32.** Count III requests a declaratory judgment and writ of mandamus; Count IV requests an injunction and writ of mandamus.

**33.** The record shows that another Crown lease agreement, that with the Township of Hampton, resulted in a notably higher rent. In an agreement entered just six months after the Lease, Crown agreed to pay $36,000 per year, in equal monthly installments for the first five years with a 20% increase every five years thereafter. In addition, the lessee also provided the Township with four antenna positions on the tower for enhanced 911 radio dispatch systems. R.R. 305(a).

**34.** The Lease between Crown and the Township does not provide for a 3% annual increase until expiration of twenty (20) years. The Lease provides the Township with six (6) antenna positions, but if they are not all used, Crown will pay $262.34 to the Township per month for each antenna position not used. These additional payments also do not begin until year 21 of the Lease. (R.R. 32a). These arrangements make it unclear that public funds are not being used here in the form of reduced rent.

*inter alia*, that the trial court should have required competitive bidding procedures to be followed. This Court affirmed the trial court, finding that there was "no expenditure of public funds for contracts or purposes." *Id.* at 645.

Despite the similarities in the respective lease agreements, *Gaab v. Sewickley* is not controlling of this case. The expenditure of public funds was essential in *Gaab v. Sewickley* where the Borough's home rule charter required contracts to be awarded on the basis of price. By contrast, the Township's Home Rule Charter requires that its contracts be awarded to the "best responsible" bidder. The different standard requires a different result.

The Trial Court also found that the Lease was exempt from competitive bidding requirements because it was a "contract relating to the acquisition or use of real property." "Use" refers to the Township's use of real property, not a private party's use of Township real estate pursuant to lease. In its answer, the Township characterizes the transaction as a commercial lease,[35] not a purchase of services. However, there is no exemption from the Township Home Rule Charter for such leases. All contracts for "valuable consideration" "to or by the Township" must be awarded to the best responsible bidder. 302 Pa.Code § 25.10–1002. Finally, there is no exception for the Lease on the ground that it is a contract for unique services, as claimed by Crown.[36]

We reverse the Trial Court's dismissal of Count V. Under the Township's Home Rule Charter, the Township was required to find the best responsible bidder to provide emergency communications service. Price alone was not to determine the choice. Further, the lease of Township realty is to be competitively bid; only property leased *by* the Township is exempt from required competitive bidding procedures.

## CONCLUSION

We hold that Residents have standing to pursue all counts of their Complaint. The Complaint states a cause of action under the common law relating to lands dedicated to a public purpose. It also states a cause of action under several statutes: under the Donated or Dedicated Property Act to the extent it seeks to enforce the Township's duty set forth in Section 3; under the Township Subdivision and Land Development Ordinance; and under the Township's Home Rule Charter. This matter is remanded to the Trial Court for consideration of defenses not yet decided by the Trial Court and, to the extent necessary to resolve facts in dispute, a hearing on the merits of each count.

## ORDER

AND NOW, this 30th day of April, 2002, the orders of the February 7, 1997, June 28, 1998, December 16, 1998 and June 28, 2000 entered by the Court of Common Pleas of Allegheny County in the above-captioned matters are reversed in part and affirmed in part. The case is remanded for further proceedings in a manner consistent with the attached opinion.

---

35. This admission must be considered on remand when the Trial Court must consider whether the Lease advances a recreation, conservation or historic purpose.

36. Computer and telephone services have been held not to be "professional" or "unique" services. *In Re: 1985 Washington County Annual Financial Report Surcharge*, 529 Pa. 81, 601 A.2d 1223 (1992); *American Totalisator Company, Inc. v. Seligman*, 27 Pa. Cmwlth. 639, 367 A.2d 756 (Pa.Cmwlth. 1976).